**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MARK MAUE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:23-cv-00443-K** |
| | § | |
| **CHAMPION HOME BUILDERS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

---

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

John M. Barcus
Texas Bar No. 24036185
john.barcus@ogletree.com
Molly Ann Lawrence
Texas Bar No. 24083365
mollyann.lawrence@ogletree.com
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas 75225
(214) 987-3800
(214) 987-3927 (Fax)

**ATTORNEYS FOR DEFENDANT**

# TABLE OF CONTENTS


I. OVERVIEW ..... 1

II. GROUNDS FOR THE MOTION AND SUMMARY OF ARGUMENT ..... 1

III. SUMMARY JUDGMENT EVIDENCE ..... 3

IV. UNDISPUTED FACTS ..... 3
- A. About Champion. ..... 3
- B. Maue's First Stint with Champion. ..... 3
- C. Read's Long-Term Plans for Maue. ..... 4
- D. The Quality Inspector Promotion. ..... 5
- E. Maue Leaves Champion But is Soon Rehired. ..... 5
- F. Maue's Disappointing Performance as APM. ..... 6
- G. The Daily Meetings. ..... 6
- H. Radio Communications. ..... 8
- I. Maue Chafes at Bocanegra's Directives. ..... 9
- J. Maue's Speculation Regarding Bocanegra's Motives. ..... 9
- K. The Corporate Site Visit. ..... 12
- L. Read's Interactions with Dave Felix. ..... 13
- M. Champion Fires Maue. ..... 14
- N. Maue Reaches Out to Felix. ..... 15
- O. Champion's Decisions Were Not Discriminatory or Retaliatory. ..... 16

V. ARGUMENT AND AUTHORITY ..... 17
- A. Summary Judgment Standard. ..... 17
- B. Applicable Law: Elements of the Claims. ..... 17
  - 1. Discrimination Under the Texas Labor Code. ..... 17
  - 2. Discrimination Under Section 1981. ..... 19
  - 3. Retaliation (Under Either Statute). ..... 20
- C. Maue's Race and National Origin Discrimination Claims Fail as a Matter of Law. ..... 21
  - 1. Language cannot be the basis of a race or national origin discrimination claim ..... 21
  - 2. Maue has no direct evidence of discrimination ..... 23
  - 3. Maue cannot establish a *prima facie* case of discrimination. ..... 23
  - 4. Champion terminated Maue's employment for legitimate, nondiscriminatory reasons, and Maue cannot demonstrate pretext. ..... 25
  - 5. The "same actor inference" applies. ..... 27
- D. Maue's Retaliation Claim Is Fatally Flawed. ..... 28
  - 1. Complaints about language by definition cannot constitute protected activity. ..... 28
  - 2. Maue cannot establish a *prima facie* case of retaliation. ..... 28
    - a. Maue did not engage in protected activity. ..... 29
    - b. Maue's *prima facie* case fails with respect to everything other than termination

**because he did not suffer an actionable adverse employment action.** .................. 30

c. **Maue's *prima facie* case fails because he does not have evidence sufficient to create a fact question regarding whether his alleged protected activities were the "but for" cause of his termination or any other purported adverse action.** ................ 31

3. **Champion has articulated legitimate, non-retaliatory reasons for its adverse actions, and Maue cannot show that they are mere pretexts for retaliation.** ...... 32

**CONCLUSION AND REQUEST FOR RELIEF** ..................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agoh v. Hyatt Corp.*,
992 F. Supp. 2d 722 (S.D. Tex. 2014) ....................20, 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................19

*Apache Corp. v. Davis*,
627 S.W.3d 324 (Tex. 2021)....................23, 35

*Belmonte v. City of Dall.*,
No. 3:19-CV-2656-G-BK, 2021 WL 1903707 (N.D. Tex. Feb. 9, 2021) ....................23

*Black v. Pan Am Labs, L.L.C.*,
646 F.3d 254 (5th Cir. 2011) ....................19

*Bostock v. Clayton County, Ga.*,
590 U.S. ---, 140 S.Ct. 1731 (2020)....................22

*Brauninger v. Motes*,
260 F. App'x 634 (5th Cir. 2007) ....................20

*Brown v. CSC Logic, Inc.*
82 F.3d 651 (5th Cir. 1996) ....................20, 25, 29

*Brown v. Fed. Express Corp.*,
No. 3:16-cv-01456-M (BT), 2019 WL 1299989 (N.D. Tex. Feb. 15, 2019),
*aff'd*, 781 F. App'x 382 (5th Cir. 2019)....................32

*Butler v. Ysleta I. S. D.*,
161 F.3d 263 (5th Cir. 1998) ....................26

*Caro v. City of Dall.*,
17 F. Supp. 2d 618 (N.D. Tex. 1998) ....................26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................19

*Cohen v. Am. Airlines Fed. Credit Union*,
Civil Action No. 23-22876-Civ-Scola, --- F. Supp. 3d ---, 2023 WL 8018913,
2023 WL 8018913 (S.D. Fla. Nov. 20, 2023)....................24

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*,
589 U.S. ---, 140 S.Ct. 1009 (2020)....................21, 22

*Cuadra v. Declaration Title Co., LLC*,
682 S.W.3d 628 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (Texas Labor Code)....22, 23, 32

*Daniels v. City of Arlington*,
246 F.3d 500 (5th Cir. 2001) ....19

*Douglass v. United Servs. Auto. Ass'n*,
79 F.3d 1415 (5th Cir. 1996) ....19, 25

*E. E. O. C. v. Omni Hotels Mgmt. Corp*.,
516 F. Supp. 2d 678 (N.D. Tex. 2007) ....29, 31

*Firs Home Owners Ass'n v. City of SeaTac*,
No. C19-1130RSL, 2022 WL 2209622 (W.D. Wash. 2022)....24

*Gordon v. APS Contractors Inc.*,
No. 21-CV-00259-WFK-JRC, 2023 WL 2574740 (E.D.N.Y. March 20, 2023)....23

*Grey v. Dallas I.S.D.*,
265 F. App'x 342 (5th Cir. 2008) ....31

*Grimes v. Tex. Dep't of Mental Health and Mental Retardation*,
102 F.3d 137 (5th Cir. 1996) ....21

*Harris-Childs v. Medco Health Solutions, Inc.*,
169 F. App'x 913 (5th Cir. 2006) ....31

*Herbert v. City of Forest Hill*,
189 S.W.3d 369 (Tex. App. – Fort Worth 2006, no pet.) ....28

*Jackson v. Honeywell Int'l, Inc.*,
601 F. App'x 280 (5th Cir. 2015) ....20, 21, 26

*Kobaisy v. Univ. of Miss*.,
624 F. App'x 195 (5th Cir. 2015) ....29

*Laxton v. Gap, Inc.*,
333 F.3d 572 (5th Cir. 2013) ....21

*Ogden v. Brennan*,
657 F. App'x 232 (5th Cir. 2016) ....28

*Paske v. Fitzgerald*,
785 F.3d 977 (5th Cir. 2015) ....31

*Pena v. Dall. Police Ass'n*,
No. 3:22-CV-0987-N-BH, 2023 WL 2146557 (N.D. Tex. 2023) ....31

*Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*,
767 F.3d 503 (5th Cir. 2014) ....................34

*Prejean v. Radiology Assocs. of Sw. La.*,
342 F. App'x 946 (5th Cir. 2009) ....................28

*Puleo v. Texana MHMR Ctr.*,
187 F. Supp. 3d 769 (S.D. Tex. 2016) ....................26

*Reed v. Neopost USA, Inc.*,
701 F.3d 434 (5th Cir. 2012) ....................20

*Tex. Health and Hum. Serv's Comm'n v. Enriquez*,
642 S.W.3d 21 (Tex. App.—El Paso 2021, no pet.)....................23

*Trevino v. City of Fort Worth*,
No. 4:12-CV-717-A, 2013 WL 4516643 (N.D. Tex. 2013) ....................29

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) ....................31

*United States v. Renda Marine, Inc.*,
667 F.3d 651 (5th Cir. 2012) ....................34

*Walton v. Bisco Indus.*,
119 F.3d 368 (5th Cir. 1997) ....................26

*Wantou v. Wal-Mart Stores Texas, L.L.C.*,
23 F.3d 422 (5th Cir. 2022) .................... *passim*

*West v. Honeywell Int'l, Inc.*,
558 F. Supp. 3d 369 (S.D. Tex. 2021) ....................22

**Statutes**

42 U.S.C. ....................4

42 U.S.C. § 1981 .................... *passim*

42 U.S.C. § 1981, and a ....................19

Tex. Lab. Code § 21.001 ....................19

Tex. Lab. Code §21.055 ....................31

Texas Commission on Human Rights Act ....................19

Texas Labor Code Section 21.051 ....................3

Texas Labor Code § 1981 and Section 21.055 ....................4

**Other Authorities**

Fed. R. Civ. P. 56(c) ....................................................................................................................19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MARK MAUE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:23-cv-00443-K** |
| | § | |
| **CHAMPION HOME BUILDERS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant Champion Home Builders, Inc. ("Champion") files this Motion for Summary Judgment and Brief in Support ("Motion") and states:

## I. OVERVIEW

Plaintiff Mark Maue ("Maue") alleges that Champion, his former employer, discriminated against him on the basis of his race and nationality, and retaliated against him for engaging in protected activity, all in violation of the Texas Labor Code and Section 1981. Champion denies these allegations, and contends that it separated Maue from employment for legitimate, non-discriminatory, and non-retaliatory reasons. The Parties have exchanged written discovery and completed several depositions. The Parties are scheduled to mediate on May 8, 2024. The case is set for trial by jury on the Court's three-week docket beginning March 3, 2025.

## II. GROUNDS FOR THE MOTION AND SUMMARY OF ARGUMENT

Champion is entitled to summary judgment on Maue's claims for race discrimination in violation of 42 U.S.C. § 1981, and for race and national origin discrimination in violation of Section 21.051 of the Texas Labor Code, for the foundational reason that language is not an inherent characteristic of either race or national origin, and "discrimination" based on the use of language is not actionable. Champion is further entitled to summary judgment because Maue has

no direct evidence of discrimination, and cannot create a fact question regarding whether (1) he was treated less favorably than "similarly-situated" employees outside of his protected classes; or (2) he suffered any actionable adverse employment action short of termination. Even if Maue is deemed to have established a *prima facie* case, Champion remains entitled to summary judgment because it has articulated legitimate, non-discriminatory reasons for its employment actions, and Maue has nothing beyond inadmissible speculation and guesswork to show that these reasons are false and pretextual, and that Champion's true motivation was discriminatory.

Champion is entitled to summary judgment on Maue's claim for retaliation in violation of 42 U.S.C. § 1981 and Section 21.055 of the Texas Labor Code because Maue cannot create a fact question regarding whether (1) he engaged in statutorily "protected activity," (2) he suffered an actionable adverse employment action other than the termination of his employment, or (3) a causal connection exists between his protected activity and any alleged adverse employment action. Champion is further entitled to summary judgment because it has articulated legitimate and non-retaliatory reasons for its employment actions, and Maue cannot create a fact question regarding whether Champion's explanations are pretextual and his protected activities were the "but for" cause of Champion's decision to terminate his employment or take any other alleged adverse action.

To the contrary, the undisputed evidence conclusively establishes that Maue did not engage in protected activity, and that the acts in which he did engage were not causally linked to any actionable adverse action. Champion's decision to separate Maue from employment was for neutral, legitimate, non-discriminatory and non-retaliatory reasons, to wit: Maue's job performance was poor, including because he failed to satisfactorily engage with the employees he supervised as the facility's Assistant Production Manager; Champion's General Manager deemed Maue's behavior during a corporate site visit inappropriate and insubordinate, and perceived from

this and other conduct that Maue was not happy working for Champion and was not a positive presence in the workforce.

## III. SUMMARY JUDGMENT EVIDENCE

Together with the Motion, Champion has filed its Appendix in Support of Motion for Summary Judgment ("Appendix"). The Appendix contains the following evidence, all of which is incorporated herein by reference in its entirety.

| Tab | Description | Pages |
|---|---|---|
| A | Excerpts from and Exhibits to the Deposition of Mark Maue | APP. 001 – APP. 100 |
| B | Declaration of Randy Read | APP. 101 – APP. 107 |
| C | Excerpts from the Deposition of Amy Newman | APP. 108 – APP. 113 |

## IV. UNDISPUTED FACTS

The following facts are undisputed:

### A. About Champion.

Champion is a leading supplier of factory-built houses including manufactured homes and mobile homes. It offers single- and multi-section manufactured homes, which are affordable alternatives to site-built and other types of manufactured housing. Champion is proud of its workforce of well-trained and professionally supervised technicians, craftsmen and assemblers. The homes Champion builds meet exacting national, state, and local building codes and are inspected at every stage of the construction process. Champion has approximately 8,500 North American employees spread across 48 manufacturing facilities and 73 retail centers, and has sold more than three million homes.

### B. Maue's First Stint with Champion.

Maue first applied to work for Champion at its Mansfield, Texas, manufacturing facility in April 2021. [App. 003 (Maue 15:5-7).] He did not know anyone who worked at Champion, and had never before worked in the manufactured home industry. [App. 003 (Maue 15:10-15).] Juan

Carlos Bocanegra ("Bocanegra"), Champion's Hispanic, bilingual[1] production manager, interviewed Maue. [App. 004 (Maue 16:4-13); App. 013 (30:4-7).] Randy Read ("Read"), Champion's Caucasian/non-Hispanic General Manager, also participated in the interview and hiring process, and was impressed with Maue. [App. 101 (Read Decl. ¶¶ 2-3).] Champion offered Maue a position as a wall builder the same day; Maue accepted. [App. 004 (Maue 16:14-18).] Maue reported to a long-term employee who spoke only Spanish. [App. 101 (Read Decl. ¶ 3).] Maue "got along with everybody" in his department. [App. 005 (Maue 17:7-17).]

**C. <u>Read's Long-Term Plans for Maue.</u>**

Read was interested in hiring Maue in large part due to statements he made during his interview in April 2021. [App. 102 (Read Decl. ¶ 4).] Maue spoke during his interview about leading others well, and his leadership experience in guiding, directing, and setting expectations for other employees. [*Id.*] He also emphasized accountability. [*Id.*] Maue gave Read the impression of being very professional, and he also had technical build knowledge and onsite construction knowledge, at least as he described his background to Read. [*Id.*]

At the time he interviewed Maue, Read began contemplating creating the position of Assistant Production Manager ("APM") and asking Maue to fill the position. [App. 102 (Read Decl. ¶ 5).] He did not yet have approval to create that position, but he told Maue that this was his long-term plan. [*Id.*] Read was looking for leadership improvement at the supervisory level within the Mansfield facility because the supervisors were generally people who had been promoted from general laborer positions without prior leadership experience. [*Id.*] Read's hope and belief was that Maue would use his purported background and skillset to help the supervisors who would report to him as APM grow as leaders of their departments. [*Id.*]

[1] Bocanegra is fluent in English and Spanish.

**D. The Quality Inspector Promotion.**

Maue switched into the role of Quality Inspector in July 2021. [App. 005 (Maue 17:21-24).] Read asked Maue to step into the vacant role. [App. 005-006 (Maue 17:25 – 18:21).] Consistent with Read's testimony described above, Maue recalls that when he first interviewed with Champion, Read said "guys like you don't come in off the street," and told Maue that he hoped to one day be able to create an "assistant production manager" position and place Maue in it. [*Id.*] In Maue's view, the quality inspector role was a stepping stone. [*Id.*] Read viewed it the same way. His goal in placing Maue in the Quality Inspector role was for Maue to gain additional knowledge and skills that would help him succeed in the APM position. [App. 102 (Read Decl. ¶ 6).] Specifically, Read's hope was that Maue would gain technical knowledge of the work done in the various departments, including areas in which he did not have prior experience. [*Id.*] As a Quality Inspector, Maue had little occasion to interact with Bocanegra. [App. 007 (Maue 22:15-18).] However, when their paths did cross, the interactions were always amicable. [App. 008 (Maue 24:19-22).]

**E. Maue Leaves Champion But is Soon Rehired.**

Maue quit after only a few weeks in the quality inspector role to take a job with Hull Homes, where he had submitted an application when he first applied to Champion. [App. 008 (Maue 24:23 – 25:10).] When Hull Homes came through with an offer to be a project manager at a better salary, Maue took it. [*Id.*] Soon after Maue left Champion, Read obtained approval to create the APM position, and proactively reached out to Maue to gauge his interest. [App. 009-010 and App. 069-093 (Maue 25:16 – 26:2 and Exh. 1); App. 102-103 (Read Decl. ¶ 7).] Read told Maue that he had finally secured permission to create the APM position, and offered Maue the job via text message. [App. 011-012 (Maue 27:19 – 28:10); App. 102-103 (Read Decl. ¶ 7).] After negotiating certain compensation terms, Maue accepted the offer. [App. 102-103 (Read Decl.

¶ 7).] In their text exchanges, Read told Maue that Bocanegra was on board with bringing Maue in as an APM. [App. 013 (Maue 30:8-14).] Maue knew that he would be reporting to Bocanegra, and was comfortable with that. [App. 013 (Maue 30:8-14); App. 014 (31:3-10) ; App. 102-103 (Read Decl. ¶ 7_.] He later signed an offer letter confirming the same. [App. 013-015 and App. 094-095 (Maue 30:24 – 32:7 and Exh. 2).] Maue understood that he was re-joining Champion as an at-will employee. [App. 014 (Maue 31:20-24).]

**F. <u>Maue's Disappointing Performance as APM.</u>**

Maue began working as the APM in the Mansfield facility in September 2021. [App. 103 (Read Decl. ¶ 8).] His job performance as the APM did not live up to Read's expectations. [*Id.*] Read observed Maue struggling to stay on task, including by regularly spending time with John Hinson in the Quality Control department rather than interacting with Bocanegra, his supervisor, as he should have been doing. [*Id.*] Bocanegra confirmed Read's observation about Maue having a hard time keeping on task. [*Id.*]

Read's expectation in placing Maue in the APM position was that Maue would interact daily with the supervisors of the various departments, build relationships with them, and use his claimed skills and experience to teach the supervisors to be better leaders. [*Id.*] According to Read, that did not happen. [*Id.*] To the contrary, Read observed that Maue did not sufficiently engage with the leadership team that reported to him, and consequently struggled to build relationships with them. [*Id.*] Read's perception throughout Maue's tenure as APM was that he was unhappy in the role. [App. 103 (Read Decl. ¶ 8).]

**G. <u>The Daily Meetings.</u>**

During Maue's tenure as APM, Bocanegra conducted daily 6:40 a.m. meetings attended by himself, Maue, and the approximately eight department supervisors (sometimes also referred to as managers) who reported to Maue. [App. 016-017 (Maue 40:15 – 41:6).] All of the participants

in the meeting knew how to speak English, and everyone other than Maue knew how to speak Spanish. [App. 017 (Maue 41:7-15).] Bocanegra always conducted the 6:40 a.m. meetings ***in English***. [App. 018-019 (Maue 42:25 – 43:3).] Bocanegra also conducted meetings with the department supervisors and Maue at 10:00 a.m. to check on the status of work. "Those were the meetings that were occasionally in Spanish." [App. 018 (Maue 42:2-21).]

The first time that happened, Maue recalls the meeting lasted about 25 minutes. [App. 020 (Maue 44:3-6).] Bocanegra "call[ed] everybody out by name, in Spanish, as they're man by man with their statuses. They replied in Spanish, at the end of the round robin, of everybody explaining." [App. 020 (Maue 44:7-21).] When the department supervisors left, Maue asked Bocanegra, "[w]hat was the information? I don't understand what's going on for the day." [App. 020-021 (Maue 44:22 – 45:2).] Bocanegra said, "[t]hey're just the same as before. They're just more comfortable in Spanish for some of these men." [*Id.*] Maue said, "I don't understand what's going on. I don't speak Spanish." [App. 021 (Maue 45:3-25).] Bocanegra replied, "[i]t's the same as others, the other meetings." [*Id.*] That was the only time Maue asked Bocanegra to elaborate or explain what had been said in Spanish during one of the 10:00 a.m. meetings. [App. 020 (Maue 44:7-15).]

After the meeting described above, Maue went to Amy Newman ("Newman") in human resources and "told her expressly that Juan Carlos had just held our morning meeting entirely in Spanish and would not respond to what the information was. I don't know how I can perform my job duties when he is excluding me from the information I'm – I'm expected to keep up with." [App. 022 (Maue 46:8-21).] Newman said she would look into it. [App. 022-023 (Maue 46:23 – 47:9).] Did Maue follow up again after that? "Nope." [App. 023 (Maue 47:10-12).]

A few days later, Maue observed several department managers join Bocanegra in his office for a meeting. [App. 023 (Maue 47:12-17).] Maue later asked Bocanegra what the meeting was

about, and he said it was to make sure the departments were going to implement a procedure suggested by Maue to ensure managers signed off on a document indicating that the work in their department had been completed. [App. 023-024 (Maue 47:18 – 48:9).] Maue asked Bocanegra whether he was supposed to have attended the meeting, but Bocanegra reassured him, "[o]h, no. That was just to make sure these guys start doing your idea." [App. 024 (Maue 48:10-16).] Maue observed that the department managers did not immediately follow the new mandate, and from that observation presumed that the meeting must have been about something else entirely. [App. 024-025 (Maue 48:17 – 49:21).]

**H. <u>Radio Communications.</u>**

Radio communications were another source of alleged frustration for Maue. Team leaders, department supervisors, and people above those levels (including Maue, Bocanegra, and Read) had multi-channel hand-held radios with them throughout the day. [App. 028 (Maue 61:9-23).] The practice for all of them was to keep the radio tuned to a common channel, but if one person wanted to speak directly to another, "you'd call for Bill and when he answers, say 'Hey, go to channel three.' And you would move off the main channel and have your conversation." [App. 028-029 (Maue 61:23 – 62:10).] If Maue wanted to speak to someone, he called out to them in English. [App. 028 (Maue 62:21-24).] Some employees with radios spoke Spanish, and "it was allowed" that they could call each other out in Spanish. [App. 029-030 (Maue 62:25 – 63:7).] Maue found this frustrating, but he never asked for an English translation of any radio communication "because it wasn't addressed to me. I would go on and do my job." [App. 031 (Maue 64:3-10).] If Maue wanted to know what was going on, he "went to their departments and found out what the issue was" – and always got the information he needed. [App. 031 (Maue 64:13-21).]

**I. <u>Maue Chafes at Bocanegra's Directives.</u>**

In Maue's mind, he got the information he needed only "because I took my own initiative." [App. 031 (Maue 64:23-25).] However, he found asking for English translation frustrating because "my job description says that I was supposed to communicate information and training in English." [App. 033 (Maue 66:1-11).] Except, as he admitted moments after that testimony, his job description says no such thing. [App. 033-034 and App. 096 (Maue 66:21 – 67:2 and Exh. 3).]

What his job description *does* say is that "when the production manager is on site, the assistant follows and supports the manager's direction." [App. 034 and App. 06 (Maue 67:3-10 and Ex. 3).] Maue adds a qualifier: in his view, he was supposed to follow Bocanegra's direction "within the limits of my job description, or what they expect my job to be." [App. 034 (Maue 67:11-21).] Maue claims that Bocanegra sometimes asked Maue to do things outside of his role as assistant production manager, including at least one or two occasions on which he asked Maue to perform manual labor. Maue did not refuse Bocanegra's instructions. [App. 035 (Maue 68:10-14).] He never said anything to Bocanegra along the lines of, "I'll do it, but that's not something in my job duties," and never asked Bocanegra anything to the effect of "why are you asking me to do that?" [App. 035-036 (Maue 68:22 – 69:4).]

**J. <u>Maue's Speculation Regarding Bocanegra's Motives.</u>**

Maue now claims that Bocanegra's requests that he perform work Maue privately found to be beneath him were discriminatory, but admits he has no evidence of a discriminatory motive beyond his own speculation and the fact that he is not Hispanic and does not speak Spanish:

> Q: Do you think you were being discriminated against when Juan Carlos asked you to do a task that you thought was outside of your job description?
>
> A: Yes.
>
> Q: And you were being discriminated against because – for what reason?
>
> A: Because I was not Hispanic.

Q: Okay. Can you explain what you mean in more detail?

A: My subordinate, the manager of the department, was not asked to do the work. But me, as a supervisor of them, was asked to go and do the manual labor instead of them taking care of their department. I didn't speak Spanish, nor do I have a Hispanic heritage.

Q: Okay. What does your ability to speak Spanish, or your lack of Hispanic heritage, have to do with Juan Carlos assigning you tasks that you thought you shouldn't have had to do?

A: He did not show any favor to me. When I made my complaints, all the way up to these points, he never responded, he never corrected, he never adjusted. Instead, if I made a complaint about a situation, he would move me into a worse position.

* * *

Q: You said that Juan Carlos assigned you to do essentially manual labor, and he didn't assign department supervisors to do the same thing. Correct?

A: Yes.

Q: Is it your belief that he was motivated in behaving that way because you are White?

A: Yes.

Q: Did he ever tell you that he was doing that because you are White?

A: No.

Q: And what is it that leads you to the conclusion that he assigned you manual labor because you are White?

A: He did not assign the same laborers to department managers. The department that had the problem, the manager was not given the task to complete it. It was given to me instead, to leave my position, and go off and do low-level, entry-level work.

Q: And your belief is that it was given to you rather than a department supervisor because you are White?

A: I was not treated the same as the Hispanic managers.

* * *

Q: And you have come to the conclusion that that ask was made of you because you were White?

A: Yes.

Q: What evidence do you have, other than your own assumptions, to support the conclusion?

A: My subordinates were not asked to do what I was asked to do.

Q: Anything else?

A: And my subordinates all being Hispanic.

* * *

Q: You've given me two reasons why you've come to the conclusion that you were treated differently because you're White. Is there anything else other than what you've already told?

A: Not that I recall.

[App. 037-042 (Maue 70:9 – 75:24).] Maue confirmed more than once that his claims are based on nothing more than rank speculation:

Q: . . . There is a distinction between Juan Carlos didn't treat me fairly, as compared to my subordinates, and Juan Carlos didn't treat me fairly, as my subordinates, because of my race. Right? There could've been other reasons that he treated you unfair[ly]. Correct?

A: What I know is, I was a superior to the other department managers, and I was treated inferior to them. I was – I was made to be their employee. They were never held to the same standard as I was held, although it was their standard that I was supposed to be upholding.

So I believe I was being discriminated against by – he – he used race. I'm sorry, ***he used language against me***. He did not treat me fair. He never asked one of his employees or one of his other managers, to do the tasks that he asked me to do. They were Hispanic. I was not.

Q: And it's from that fact that you draw the conclusion that Juan Carlos was motivated by race and national origin, and not something else?

A: Correct.

[App. 067-068 (Maue 116:15 – 117:14).] And "that could be just because Juan Carlos is a lousy manager. Right?" "I couldn't tell you why Juan Carlos would allow that." [App. 062-064 (Maue 98:24 – 100:20).]

**K. <u>The Corporate Site Visit.</u>**

Champion's corporate Operational Excellence team visited the Mansfield facility in February 2022 to engage "Value Stream Mapping." [App. 103 (Read Decl. ¶ 9).] Value Stream Mapping ("VSM") is the process used by organizations like Champion to analyze and optimize the manufacturing process. [*Id.*] Maue knew in advance that the visit was going to occur, and understood that the goal was to find efficiencies and "help us improve." [App. 044-045 (Maue 77:14 – 78:11).]

During the week of the visit, Bocanegra tasked Maue with supervising the roof build department, because the prior supervisor, Daniel Ramirez, had very recently been terminated, and the department required supervision. [App. 045-046 (Maue 78:15 – 79:8); App. 103 (Read Decl. ¶ 9).] Bocanegra had initially taken on the responsibility of watching the department following Ramirez's separation, but as the Production Manager, Bocanegra was directly involved in the site visit and thus unable to adequately monitor the roof build department at that time. [App. 046 (Maue 79:9-15).] Read viewed the assignment as an excellent opportunity for Maue, because "for an APM who doesn't have supervisory experience on the floor, this should have been a time for Maue to engage with the employees in the roof build department and learn what the job entailed." [App. 103 (Read Decl. ¶ 9).]

Maue did not remain in the roof build department as assigned. [App. 103-104 (Read Decl. ¶ 10).] During the course of the week, Read observed him following the Operational Excellence team around the facility and engaging members of the team in conversation. [*Id.*] He also observed Maue going outside the facility, where he picked up screws off the ground, which is not an appropriate task or use of time for an APM (or a department supervisor, for that matter). [*Id.*] Maue did those things rather than supervise the roof build department, as he had been instructed. [*Id.*] It

was concerning to Read "that Maue, who was supposed to be our 'number two in the plant, was not following simple instructions." [*Id.*]

**L. Read's Interactions with Dave Felix.**

During the corporate site visit, Maue approached one of the Operational Excellence team members, whose name he did not recall at the time of his deposition, but who is known from other evidence to be Dave Felix ("Felix"). [App. 047 (Maue 80:12-20).] Maue remembers that the gentleman was White and not Hispanic. [App. 048 (Maue 81:4-8).] Maue described his interaction with Felix and the other members of the VSM team as follows:

> Q: . . . In any conversations you've had with any members of the site visit team, did you express negative opinions about Juan Carlos?
>
> A: I expressed to them I was glad to see if we can't do some improvements on the facility. . . . When they asked me why things are done a certain way, I explained they have to talk to Juan Carlos. He's the manager.
>
> Q: Did you express to them any opinions about Juan Carlos' work as a manager?
>
> A: I believe so.
>
> Q: What opinions do you recall expressing?
>
> A: That they had a complaint about how something was being performed. I shared with them that I agree with the complaint. I had shared it with Juan Carlos, but nothing was – had been done to correct it.
>
> Q: Did you express any opinions, regarding Randy Read, during these conversations?
>
> A: I do not believe so.
>
> Q: Did you raise the issue of Spanish being spoken in the workplace in any of these conversations with the corporate team?
>
> A: I do not recall.
>
> Q: Did you raise the fact that you had made some complaints to HR during these conversations with the corporate team?
>
> A: I don't recall.

Q: Is there anything else you do recall about these conversations?

A: I'm sure I voiced my discontent with being able to perform my job duties.

[App. 048-050 (Maue 81:4 – 83:8).]

After the VSM process was complete, Felix reached out to Read and told him that "Maue would not be on my team and shouldn't be on yours." [App. 104 (Read Decl. ¶ 11).] Felix told Read that Maue expressed disdain for Bocanegra, Read, and the Mansfield plant in general. [*Id.*]

**M. <u>Champion Fires Maue.</u>**

Champion fired Maue on February 18, 2022. [App. 050 (Maue 83:21-23).] Read communicated the decision to Maue in a meeting in Read's office, also attended by Newman and Bocanegra.[2] [App. 050-051 (Maue 83:24 – 84:6).] Maue recalls that Read relayed his perception that Maue was "not happy" at Champion, and also communicated that Read had left his station. [*Id.*] The termination "was a total surprise." [App. 052 (Maue 85:3-6).] Maue did not ask any questions, but recalls expressing to Read that "I've struggled with Juan Carlos as a supervisor. I did not believe that he was a – a good supervisor, and is most of the problem on the floor, and with my position. And I told [Read] to have a nice day and exited the building." [App. 051 (Maue 84:7-12).]

Read's recollection of the meeting is the same as Maue's. Prior to the meeting, he met with Newman and Bocanegra, told them about his discussion with Felix and his general impressions of Maue, and sought their input before making the decision to terminate Maue's employment.[3] [App. 104 (Read Decl. ¶ 12).] Read was the sole decisionmaker. [*Id.*][4]

---

[2] Newman and Bocanegra did not speak during the meeting. [App. 051 (Maue 84:13-18).]

[3] Read and Newman are both Caucasian. [App. 065-066 (Maue 102:24 – 103:3).]

[4] Maue does not know who made the final decision to terminate his employment. [App. 051 (Maue 84:22-24).] He does not know what factors were taken into account in the decision to terminate his employment. [App. 051-052 (Maue 84:25 – 85:3).]

The only factors in Read's decision were his personal observations of Maue's discontent, Maue's failure to connect with the employees assigned to work for him, his behavior during the Operational Excellence visit, the input Read received from Felix, and Maue's insubordination in failing to supervise the roof build department despite having been directed to do so. [App. 104 (Read Decl. ¶ 12).] "The fact that Maue was effectively the second-in-command in the facility with respect to production, and yet was unable or unwilling to follow simple and direct instructions, was not acceptable to me." [*Id.*]

Maue did not ask Read to reconsider the decision. [App. 052 (Maue 85:7-9).] Nobody told or insinuated to Maue that one of the reasons for his termination was because he had advised other employees to take certain concerns to HR. [App. 052-053 (Maue 85:24 – 86:3).] Nobody ever told Maue that they were upset with him for directing people to HR, and nobody ever expressed that such was the reason, or even one of the reasons, for his termination. [App. 056 (Maue 89:1-8).] Maue does not know whether Bocanegra or Read were even aware that he had suggested to other employees that they reach out to HR. [App. 057 (Maue 90:5-10).]

**N. <u>Maue Reaches Out to Felix.</u>**

After learning of Champion's decision to terminate his employment, Maue texted Felix, "I don't know if you knew this was coming, but Randy fired me. His reason was that I was discontent in working there. I told him that couldn't be further from the truth." [App. 057 and App. 097 (Maue 90:13-25 and Exh. 5).] Maue reached out to Felix "because of conversation we had already had prior to. They seemed pleased with what I was doing and the repairs that I had showed them. And it came as a total surprise to me." [App. 058 (Maue 91:1-10).] Felix responded to Maue's text:

> Mark, that is unfortunate to hear. However, based from what I heard from you during my site visit, I would have to agree with Randy. During my visit, not one time did I hear you "brag" about who you work for or about what we do as a company. My impression? It seemed you felt defeated and wanted confirmation,

> based from what I heard, that this feeling you had was valid. I'm sorry, but I am unable to do so.

[App. 058-059 and App. 098 (Maue 91:18 – 92:22 and Exh. 5).] Maue does not know whether Felix previously shared those concerns with Read or Bocanegra, and does not know whether they were taken into account in the decision to terminate his employment. [App. 060-061 (Maue 93:24 – 94:8).]

Read agrees that he told Maue that he perceived Maue as being discontent in working at Champion, as Maue had expressed to Felix. [App. 104-105 (Read Decl. ¶ 13).] Read specifically recalls telling Maue, "you're not happy to be here." [*Id.*] Felix's response to Maue's text is consistent with what Felix told Read (*i.e.*, that Maue expressed disdain for Bocanegra, Read, and the Mansfield plant in general), and what Read took into account – along with Maue's insubordination in refusing to follow clear instructions to supervise the roof build department – when making the decision to terminate Maue's employment. [*Id.*]

**O. <u>Champion's Decisions Were Not Discriminatory or Retaliatory.</u>**

Read's decision to terminate Maue's employment was not motivated by Maue's race or national origin. [App. 105 (Read Decl. ¶ 14).] His decision was not motivated by Maue's inability to speak Spanish, or Maue's expressions of frustration about the prevalence of the Spanish language in parts of the workplace. [*Id.*] His decision to terminate Maue's employment was not based on any complaints Maue made to Newman (or anyone else) about his perception that the use of Spanish was an act of discrimination based on his Caucasian race and non-Hispanic national origin. [*Id.*][5] As noted above, Maue admits he has no evidence to the contrary.

---

[5] Read is also Caucasian and non-Hispanic. [App. 105 (Read Decl. ¶ 14).] Sam House replaced Maue as APM. App. 110 ([Newman 103:11-16).] He is Caucasian and non-Hispanic. [*Id.*]

## V. ARGUMENT AND AUTHORITY

Based on the foregoing facts, the Court should grant the Motion for each of the following reasons:

### A. Summary Judgment Standard.

Champion presumes the Court is familiar with the standards for summary judgment and will not repeat them in detail. *See generally* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). The Texas Commission on Human Rights Act is interpreted in a manner consistent with federal laws prohibiting employment discrimination. *See generally* Tex. Lab. Code § 21.001 (goal of act is to execute policies of Title VII). Therefore, in analyzing Maue's state-law claims, the Court may and should utilize the same analysis that would apply had Maue elected to plead his claims under federal law. *See, e.g.*, *Black v. Pan Am Labs, L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011) (evaluating Texas Labor Code and Title VII claims under the same analytical framework); *Daniels v. City of Arlington*, 246 F.3d 500, 507 (5th Cir. 2001) (same).

### B. Applicable Law: Elements of the Claims.

Maue has asserted causes of action for race and national origin discrimination in violation of the Texas Labor Code, race discrimination under 42 U.S.C. § 1981, and a generic claim of retaliation for "reporting discrimination." The elements of these claims are as follows:

#### 1. Discrimination Under the Texas Labor Code.

A Title VII or Texas Labor Code litigant may establish a claim of discrimination "by presenting direct evidence or by using the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*."[6] *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 732 (S.D. Tex. 2014). Direct evidence

---

[6] 411 U.S. 972 (1973).

"proves intentional discrimination without inference or presumption when believed by the trier of fact." *Id.* (quoting *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 272 (5th Cir. 2006)). It includes "any statement or written document showing a discriminatory motive on its face." *Id.* (quoting *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 195 (5th Cir. 2001)).

To constitute direct evidence of discriminatory animus, a remark must be related to the protected class of persons of which the plaintiff is a member; proximate in time to the adverse employment action; made by an individual with authority over the employment decision; and related to the employment decision at issue. *Brown v. CSC Logic, Inc.* 82 F.3d 651, 655 (5th Cir. 1996). *See, e.g., Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (four-part test continues to apply where plaintiff offers a remark as "direct evidence" of discrimination"); *Brauninger v. Motes*, 260 F. App'x 634, 640 n. 8 (5th Cir. 2007) (to constitute direct evidence, comments must be "related and proximate to employment decision").

As the Court is likely well aware, a plaintiff lacking direct evidence, and therefore proceeding under *McDonnell Douglas*, must first demonstrate a *prima facie* case of discrimination. *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 284 (5th Cir. 2015). He does so by showing that he: "(1) is a member of a protected class, (2) was qualified for the position at issue, (3) was discharged or suffered some adverse employment action by the employer, and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Id.* The burden then shifts to the employer to *articulate* a legitimate, non-discriminatory reason for its actions. *Id.* The final burden then shifts back to the employee to prove that the employer's stated reason is false and a mere pretext for discrimination, or that if the employer's stated reason is true, it is only one of the reasons for its conduct, and that the employee's protected characteristic (*e.g.*, race or national origin) was another motivating factor. *Id*.

Put another way, to avoid summary judgment, Maue must adduce evidence that, taken as a whole, "(1) creates a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer and (2) creates a reasonable inference that race [or national origin] was a determinative factor in the actions of which plaintiff complains." *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 141 (5th Cir. 1996). "Mere subjective assertions, without more, are insufficient to prove that the employers articulated reasons for his termination are pretextual," and "simply disputing the underlying facts of an employer's decision" is likewise not enough; the plaintiff "must rebut each non-discriminatory reason articulated by the employer." *Agoh,* 992 F. Supp. 2d at 736-737. *See Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2013) (to survive summary judgment, plaintiff must produce evidence raising fact question regarding whether each of defendant's articulated reasons are "false or unworthy of credence").

**2. <u>Discrimination Under Section 1981.</u>**

The elements of a race discrimination claim under Section 1981 are similar but not identical to the elements of a Texas Labor Code (or Title VII) claim. Section 1981 provides that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981. Notably, to prevail under Section 1981, a plaintiff must prove "but for causation." What is a "but-for cause" in the context of Section 1981? The Supreme Court recently explained that "a plaintiff must demonstrate that, but for the defendant's unlawful conduct, [the plaintiff's] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. ---, 140 S.Ct. 1009, 1014 (2020).

Thus, to prevail under Section 1981, "a plaintiff must initially plead and prove that, but for race, it would not have suffered the loss of a legally protected right." *Id.* at 1019. *See also Bostock v. Clayton County, Ga.*, 590 U.S. ---, 140 S.Ct. 1731, 1739 (2020) ("a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for

cause"). In *Comcast*, after discussing what "but for" *means*, the Court removed all doubt as to whether Title VII's "motivating factor" standard and Section 1981's "but for" standard are equivalent; they are not. *Id.* at 1017-1018. A Section 1981 claim is harder to prove. *See, e.g., West v. Honeywell Int'l, Inc.*, 558 F. Supp. 3d 369, 378 (S.D. Tex. 2021).

**3. <u>Retaliation (Under Either Statute).</u>**

To establish a *prima facie* case of retaliation under the Texas Labor Code or Section 1981, a plaintiff must show that (1) he participated in an activity protected under the statute; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.3d 422, 436-437 (5th Cir. 2022) (citing *Washburn v. Harvey*, 504 F.3d 505, 510 (5th Cir. 2007). *See, e.g., Cuadra v. Declaration Title Co., LLC*, 682 S.W.3d 628, 635 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (Texas Labor Code).

"The burden of production then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the alleged retaliatory action. *Id.* "If the defendant satisfies this burden, the plaintiff must offer sufficient evidence that the proffered reason is a pretext for retaliation." *Id.* (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005)). The employee's ultimate burden is to prove that the adverse employment action "would not have occurred but for the protected conduct." *Id.* That is, "even if a plaintiff's protected conduct is a substantial element in a defendant's adverse employment action, no liability for unlawful retaliation arises if the employee would have faced that discipline even without the protected conduct." *Id.* (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).

The standard is the same under the Texas Labor Code. *Apache Corp. v. Davis*, 627 S.W.3d 324, 337 (Tex. 2021). "[D]etermining but-for causation cannot be a matter of weighing – or worse, counting – factors that may be helpful in analyzing circumstantial evidence in some situations."

*Id.* "Rather, our focus must be on whether 'but for' the protected activity, the termination would not have occurred when it did." *Tex. Health and Hum. Serv's Comm'n v. Enriquez*, 642 S.W.3d 21, 33 (Tex. App.—El Paso 2021, no pet.).

**C. <u>Maue's Race and National Origin Discrimination Claims Fail as a Matter of Law.</u>**

Maue has pleaded causes of action for race discrimination under Section 1981 and race and national origin discrimination under the Texas Labor Code. For the reasons below, Champion is entitled to summary judgment.

**1. <u>Language cannot be the basis of a race or national origin discrimination claim.</u>**

Maue's claim fails coming out of the gate for the simplest of reasons: ***"[l]anguage is not a racial or national origin trait and, thus, cannot be the basis of a race or national origin discrimination claim.*** While language may be used as a covert basis for national origin discrimination, that is the exception rather than the rule." *Belmonte v. City of Dall.*, No. 3:19-CV-2656-G-BK, 2021 WL 1903707, at *2 (N.D. Tex. Feb. 9, 2021), report and recommendation adopted, 2021 WL 1895244 (N.D. Tex. May 10, 2021) (citing *Garcia v. Gloor*, 618 F.2d 264, 278 (5th Cir. 1980)). The *Belmonte* court went on to explain that "in those exceptional instances, such discrimination is focused on forbidding the use of a language as an expression of culture[.]" *Id.*

Maue does not allege such circumstances here, and his theory of unlawful discrimination related to use of Spanish in the workplace finds no support in law. *See, e.g.*, *Gordon v. APS Contractors Inc.*, No. 21-CV-00259-WFK-JRC, 2023 WL 2574740, at *7 (E.D.N.Y. March 20, 2023) (finding that inability to speak Spanish is not a proxy for national origin or race discrimination, and noting "[i]ndeed, people who are Latino may not speak Spanish and people who speak Spanish may not be Latino."); *Firs Home Owners Ass'n v. City of SeaTac*, No. C19-1130RSL, 2022 WL 2209622, at *5 (W.D. Wash. 2022) ("any distinction, restriction, or

discrimination was on the basis of language, not national origin. Not all Spanish-speakers share the same national origin, nor is language an immutable characteristic.”).

A case very closely on point factually was decided late last year. In *Cohen v. American Airlines Federal Credit Union*, the plaintiff, who was of American national origin, alleged that after she began reporting to a Hispanic supervisor, the supervisor “expressed frustration at the Plaintiff’s inability to speak Spanish and would frequently speak Spanish, with other employees, in front of Plaintiff despite the Plaintiff repeatedly asking [the supervisor] to stop this unjustified criticism.” *Cohen v. Am. Airlines Fed. Credit Union,* Civil Action No. 23-22876-Civ-Scola, --- F. Supp. 3d ---, 2023 WL 8018913, 2023 WL 8018913, at *4 (S.D. Fla. Nov. 20, 2023) (slip copy). She sued for national origin discrimination.

The defendant moved to dismiss, arguing that the plaintiff failed to plead facts showing that her membership in the protected class (*i.e.*, American national origin) was causally linked to the alleged adverse employment actions. The court agreed, and explained:

> even if these criticisms and [the supervisor’s] alleged efforts to exclude the Plaintiff from conversations conducted in Spanish rise to the level of adverse employment action, which they likely do not, ***the ability or inability to speak Spanish is not equivalent to national origin.*** The Plaintiff does not plead any facts connecting alleged animus against non-Spanish speakers to animus against members of the Plaintiff's protected class (Americans). Many Americans speak Spanish, and many non-Americans do not speak Spanish. There is therefore no basis on which the Court can infer that the Defendant discriminated against the Plaintiff on the basis of her national origin.

*Id.* at *3. The court granted the defendant’s motion to dismiss the plaintiff’s national origin discrimination claim.

This Court should reach the same conclusion, for the same reason: even if it is true that Champion employees discriminated against Maue because of his inability to speak Spanish, that does not constitute discrimination based on *national origin* (and certainly not discrimination based

on race). The Court should decline Maue's invitation to conflate language with national origin or race, and grant the Motion on this basis alone.

**2. <u>Maue has no direct evidence of discrimination.</u>**

Maue does not contend that any of Champion's decisionmakers made remarks to him regarding his race or national origin, whether in connection with his work assignments, termination, or otherwise. As discussed above, to constitute direct evidence of discriminatory animus, a remark must be related to the protected class of persons of which the plaintiff is a member; proximate in time to the adverse employment action; made by an individual with authority over the employment decision; and related to the employment decision at issue. *Brown*, 82 F.3d at 655. Maue does not allege the existence of direct evidence in the Complaint, but to the extent he intends to pursue that theory of liability, the claim fails as a matter of law, and Champion is entitled to summary judgment.

**3. <u>Maue cannot establish a *prima facie* case of discrimination.</u>**

Champion is likewise entitled to summary judgment under the indirect evidence *McDonnell Douglas* analysis. "It is more than well-settled that an employee's subjective belief that []he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion[.]" *Douglass*, 79 F.3d at 1429. As proof of discrimination because of his race and national origin, Maue alleges he was treated less favorably than his "subordinates." According to Maue, his Hispanic "subordinates were not asked to do what I was asked to do" and, further, he "was held to a different standard than my subordinates. They being Hispanic, did not have to follow the protocol. Me, I had to follow it." [App. 040-042 (Maue 73:9-75:24), App. 062-064 (98:24-100:14); App. 067-068 (116:1-117:14).] However, as subordinates, the alleged comparators Maue points to were not similarly situated to him and, therefore, Bocanegra's treatment of them is irrelevant. *See Caro v. City of Dall.*, 17 F. Supp. 2d

618, 626 (N.D. Tex. 1998) ("As a subordinate, this employee was not similarly situated to Caro or the other Unit supervisors."). "It is not discrimination to treat differently situated persons differently." *Walton v. Bisco Indus.*, 119 F.3d 368, 373 (5th Cir. 1997). Because Maue's evidence, such as it is, is insufficient to raise a fact issue on the fourth *prima facie* element of discrimination (less favorable treatment than other similarly-situated employees outside of the protected group), summary judgment is appropriate on this basis alone.

Even if the Court determines that Maue was "similarly situated" to other Champion employees, he still lacks evidence sufficient to demonstrate a *prima facie* case. Setting aside for now his claim of wrongful termination (which is discussed below), Maue does not have evidence that he suffered an actionable "adverse action." *Jackson*, 601 F. App'x at 284. A plaintiff suffers an adverse employment action when there is "a significant change in [the plaintiff's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Butler v. Ysleta I. S. D.*, 161 F.3d 263, 268 (5th Cir. 1998). "For an action to be considered 'adverse,' it must go beyond 'petty slights, minor annoyances, and simple lack of good manners.'" *Puleo v. Texana MHMR Ctr.*, 187 F. Supp. 3d 769, 781-782 (S.D. Tex. 2016).

Maue is unhappy that some Champion employees spoke Spanish in his presence or on the radio, though he admits he never asked for an English translation of any radio communication "because it wasn't addressed to me. I would go on and do my job." [App. 031 (Maue 64:3-10).] If Maue wanted to know what was going on, he "went to their departments and found out what the issue was" – and always got the information he needed. [App. 031 (Maue 64:13-21).] He does not like that Bocanegra spoke Spanish in certain morning meetings, though he admits Bocanegra never failed to translate when Maue asked him to do so. Maue speculates that Bocanegra intentionally excluded him from a "spot meeting" held in Bocanegra's office, and he took offense at Bocanegra

occasionally asking him to assist in performing manual labor. None of those things, whether considered in isolation or together, constitutes an actionable adverse employment action. Maue cannot establish the third element of his *prima facie* case of discrimination with respect to any acts that took place prior to his termination.

**4. <u>Champion terminated Maue's employment for legitimate, nondiscriminatory reasons, and Maue cannot demonstrate pretext.</u>**

With respect to Maue's allegation that Champion's decision to terminate his employment was based on his race or national origin, even if the Court presumes that Maue is able to make out a *prima facie* case,[7] Champion has articulated one or more legitimate, nondiscriminatory reasons for its decision to end Maue's employment.

Specifically, Read observed Maue engage in insubordination that he found unacceptable from the "number two in the plant" (namely, failure to follow simple instructions to supervise the roof build department as told to do), and he perceived based on Maue's behavior that Maue was not happy in the role of APM. [App. 103-104 (Read Decl. ¶ 10).] Further, as discussed in detail above, Maue was not living up to the performance expectations Read had for him in the APM role. [App. 103 (Read Decl. ¶ 8).] Read had high hopes for Maue's ability to use his background and skills to help develop Champion's department supervisors' leadership skills. Maue simply failed to do so.

Courts in the Fifth Circuit and Texas have repeatedly held inadequate performance and unprofessional behavior to be legitimate, nondiscriminatory reasons for termination. *See, e.g.*, *Prejean v. Radiology Assocs. of Sw. La.*, 342 F. App'x 946, 950 (5th Cir. 2009) (finding employer's concerns about employee's conduct and behavior to be legitimate, non-discriminatory reason for

[7] He cannot, because he cannot establish the fourth element – less favorable treatment than a similarly-situated comparator.

adverse action); *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 376 (Tex. App. – Fort Worth 2006, no pet.) (holding that employer stated legitimate, nondiscriminatory reason for adverse action where employer "cited many job-related reasons for losing confidence in" employee). Champion has carried its burden under the *McDonnell Douglas* framework to articulate a legitimate, non-discriminatory reason for its decision to terminate Maue's employment.[8]

The burden therefore shifts back to Maue to create a fact question regarding whether Champion's articulated reasons for terminating his employment are false or pretextual. This he cannot do, and he certainly cannot raise a fact question regarding whether Champion would not have terminated his employment "but-for" his race or national origin.

Maue testified that he does not know who made the decision to terminate his employment or what factors were taken into account. [App. 060-061 (Maue 93:24 – 94:8).] Maue's admission is fatal to his case, because it leaves him with only his unsupported speculation that the decisionmaker was motivated by Maue's race or national origin to the point that the termination never would have occurred but-for the fact that Maue is Caucasian and non-Hispanic. As the Fifth Circuit recently explained, "to show pretext, [Plaintiff] only offers conclusory assertions based on his subjective opinion that he was not at fault[.] Disagreeing with his employer's assessment of his performance is insufficient to create a genuine dispute of material fact." *Ogden v. Brennan*, 657 F. App'x 232, 236 (5th Cir. 2016) (internal citation omitted). Maue's dissatisfaction with his work environment leads him to speculate that Champion's termination decision was discriminatory, but he has nothing else to go on. As a matter of law, Maue cannot create a fact question regarding whether Champion's articulated reasons for its decision are merely pretexts for discrimination. Champion is entitled to summary judgment.

---

[8] Champion has done much more than "articulate" a non-discriminatory reason. The evidence cited above *proves* that Champion did not discriminate against Maue.

**5. <u>The "same actor inference" applies.</u>**

Finally, the evidence in this case entitles Champion to a presumption that any adverse actions taken by Read were not based on his race or national origin. *See Trevino v. City of Fort Worth*, No. 4:12-CV-717-A, 2013 WL 4516643, at *7 (N.D. Tex. 2013) ("The same actor inference [] creates a presumption that the adverse action imposed on a plaintiff was not the result of unlawful discrimination"). It is undisputed that Read participated, in whole or in part, in hiring Maue and placing him in the APM role. [App. 101 (Read Decl. ¶¶ 2-3).] Read was also the sole decisionmaker regarding his termination. [App. 104 (Read Decl. ¶ 12).] Because Read was responsible for both Maue's hiring and his termination, there is an inference that discrimination was not the reason for the adverse action against Maue (termination). *See Kobaisy v. Univ. of Miss.*, 624 F. App'x 195, 199 (5th Cir. 2015) (affirming summary judgment and agreeing with district court's use of same actor inference to infer lack of national origin discrimination where same person was responsible for the plaintiff's initial hiring and subsequent failure to reinstate); *E. E. O. C. v. Omni Hotels Mgmt. Corp.*, 516 F. Supp. 2d 678, 703-04 (N.D. Tex. 2007) (grating summary judgment in part because "the key decision-makers who hired and promoted" plaintiff "collaborated in the decision" to impose the allegedly adverse employment actions. *See Brown v. CSC Logic, Inc.*,82 F.3d 651, 658 (5th Cir.1996)("[c]laims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, [i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job") (*quoting Proud v. Stone*,945 F.2d 796, 797 (4th Cir.1991)) (internal quotation marks omitted)). For this reason and all of the others, the Court should grant summary judgment on all

aspects of Maue's discrimination claim that are premised on actions taken by Read – including, of course, the decision to terminate his employment.

## D. Maue's Retaliation Claim Is Fatally Flawed.

The Court should grant summary judgment on Maue's retaliation claims as well.

### 1. Complaints about language by definition cannot constitute protected activity.

As explained above, the ability or inability to speak the Spanish language is not inherently tied to either race or national origin. Accordingly, to the extent Maue's retaliation claim is premised on the notion that he complained about Spanish being spoken in the 10:00 a.m. meetings, or by employees in his presence and allegedly to his exclusion, or on the fact that he encouraged other Caucasian, non-Hispanic employees to complain about the prevalence of Spanish in the workplace and how it allegedly made their job more difficult, he did not engage in protected activity because he did not complain about actionable discrimination either under Section 1981 (which of course deals only with race) or the Texas Labor Code. The Court can and should grant the Motion for this reason alone.

### 2. Maue cannot establish a *prima facie* case of retaliation.

As discussed above, to establish a *prima facie* case of retaliation under the Texas Labor Code or Section 1981, a plaintiff must show that (1) he participated in an activity protected under the statute; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Wantou*, 23 F.3d at 436-437. Maue's claim fails for several reasons. First, he has no evidence that he engaged in a statutorily protected activity. Second, apart from the termination decision, Maue cannot show that Champion took actionable adverse employment action against him. Third, Maue does not have

evidence to connect the dots – he cannot show that "but for" his alleged protected activity, he would still have a job.

**a. Maue did not engage in protected activity.**

Maue first must show that he "oppose[d] a discriminatory practice." Tex. Lab. Code §21.055. To satisfy this requirement, he must establish that he complained of discrimination based on his race or national origin – merely raising complaints about "unfair or undesirable treatment" in the workplace is insufficient. *See Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (finding no protected activity where plaintiff's complaints to her employer did not allege that she was treated unfairly due to her race or gender); *Pena v. Dall. Police Ass'n*, No. 3:22-CV-0987-N-BH, 2023 WL 2146557, at *6 (N.D. Tex. 2023) (citing *Harris-Childs* and finding that although the plaintiff alleged several complaints about "harassment and discrimination," general allegations were not enough).

The cases on this point are legion, and they are consistent. *See, e.g.*, *Paske v. Fitzgerald*, 785 F.3d 977, 986 (5th Cir. 2015) (the Fifth Circuit "has consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity"); *Grey v. Dallas I.S.D.*, 265 F. App'x 342, 347 (5th Cir. 2008) (affirming summary judgment on race retaliation claim because the plaintiff's complaints made "no mention of race"); *Turner v. Baylor Richardson Med. Ctr*., 476 F.3d 337, 349 (5th Cir. 2007) (holding that an employee's email to Human Resources complaining of supervisor's treatment, but failing to mention race did not give rise to a protected activity to support a prima facie case of retaliation); *EEOC v. Omni Hotels Mgmt. Corp*., 516 F. Supp. 2d 678, 705 (N.D. Tex. 2007) (explaining that vague concerns or even vague discrimination claims do not suffice to constitute an opposition to an unlawful employment practice).

During his employment, Maue "complained" to Bocanegra, Read, and HR that he did not speak Spanish. [App. 031 (Maue 64:3-12), App. 032 (65:9-21).] He complained "about the language." [App. 067 (Maue 116:1-12).] He complained "to the front office" he was "being discriminated because I was being left out of conversations intentionally." [App. 036 (Maue 69:18-20).] He complained to HR that he "should not be doing [laborer] level of work because I can't do my job if I'm stuck in a – at a table, all day." [App. 026-027 (Maue 58:19-59:18).] Maue may have generally complained to Champion about discrimination, but he did not mention discrimination *based on race or national origin*. In a reporting context, "not every insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Brown v. Fed. Express Corp.*, No. 3:16-cv-01456-M (BT), 2019 WL 1299989, at *6 (N.D. Tex. Feb. 15, 2019), *aff'd*, 781 F. App'x 382 (5th Cir. 2019). Protected activity requires "specific allegations" about mistreatment due to the plaintiff's membership in a protected class. Maue made no such complaints, and his own testimony is to the contrary. The Court should grant summary judgment on the retaliation claim for this reason alone.

**b. Maue's *prima facie* case fails with respect to everything other than termination because he did not suffer an actionable adverse employment action.**

As with the cause of action for discrimination, to make out a *prima facie* case of unlawful retaliation under either the Texas Labor Code or Section 1981, Maue is required to show that Champion took an actionable "adverse employment action" against him. *Wantou*, 23 F.3d at 436-437; *Cuadra*, 682 S.W.3d at 635. And, as with the discrimination claim, Maue is unable to do so with respect to any action taken against him *other than* Champion's decision to separate him from employment. As discussed above, Maue contends that after he complained about Spanish being spoken in his presence and/or after he encouraged other employees to complain to HR about the same or similar things, Bocanegra "never responded, he never corrected, he never adjusted. Instead, if I made a complaint about a situation, he would move me into a worse position," *i.e.*,

assign Maue to occasionally perform manual labor and to supervise the roof build department in the absence of its regular supervisor: "Retaliation [occurred] when I did not – if I – if I did something, he would put me in a lesser position. So to complain about the language, I was retaliated against by putting – being put as a laborer somewhere." [App. 067 (Maue 116:1-12).] Maue suffered no loss in pay or benefits. He was simply asked to perform tasks that needed to be done, which is something Maue *agrees* Bocanegra was entitled to do. [App. 026 (Maue 58:7-10).] That is not an actionable adverse employment action. To the extent Maue's retaliation claim is premised on anything other than the termination of his employment, it fails as a matter of law.

**c. Maue's *prima facie* case fails because he does not have evidence sufficient to create a fact question regarding whether his alleged protected activities were the "but for" cause of his termination or any other purported adverse action.**

Assuming *arguendo* that Maue can create a fact question regarding the first two elements of his *prima facie* case, *i.e.*, that he engaged in protected activity and suffered adverse action as a result, to avoid summary judgment, he still must show that a causal connection exists between the protected activity and the adverse action. *Wantou*, 23 F.3d at 436-437 (federal statutes). He cannot.

As demonstrated above, Maue does not know who made the decision to terminate his employment, and does not know what factors they considered. [App. 051-052 (Maue 84:22 – 85:2).] It happens to have been Read. Maue does not know whether Read even knew that Maue engaged in the (arguably) protected activity of encouraging other employees to bring complaints to HR. [App. 057 (Maue 90:8-10).] Nobody ever told Maue that they were upset with him for having done so, or that his actions were even one of the reasons for Champion's decision to terminate his employment. [App. 055-056 (Maue 88:22 – 89:11).] Read testified regarding all of the factors he *did* take into account in making the ultimate employment decision, and none of them

involved Maue having engaged in conduct that might reasonably be characterized as "protected activity."

It is a bedrock principle of law that "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *United States v. Renda Marine, Inc.*, 667 F.3d 651, 655 (5th Cir. 2012) (quoting *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003)). *See, e.g.*, *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) ("conclusional [*sic*] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation to dot adequately substitute for specific facts showing a genuine issue for trial.")

Maue cannot rely on his own speculation to overcome (1) his admissions and (2) Read's unequivocal and uncontroverted testimony. He has nothing *beyond* his own speculation and guesswork. Accordingly, Maue cannot create a fact issue on the "causal connection" element of his *prima facie* case, and Champion is entitled to summary judgment on the retaliation claim for this reason as well.

**3. Champion has articulated legitimate, non-retaliatory reasons for its adverse actions, and Maue cannot show that they are mere pretexts for retaliation.**

Assuming *arguendo* that Maue can create a fact question regarding every element of his *prima facie* claim of retaliation, the burden shifts briefly to Champion, but only to *articulate* legitimate, non-retaliatory reasons for its termination decision and any other allegedly adverse employment action. It has done so, for the reasons discussed above in the context of the discrimination claim. The burden therefore shifts back to Maue, this time to present evidence sufficient to create a fact question regarding whether Champion's stated reasons are mere pretexts, and that his protected conduct was the "but for" cause of the adverse actions.

"But for" causation is a significantly higher bar than demonstrating a "causal connection" in the context of the *prima facie* case. At this final stage, Maue's burden is to prove that the adverse employment action "would not have occurred but for the protected conduct." *Wantou*, 23 F.3d at 436-437. That is, "even if a plaintiff's protected conduct is a substantial element in a defendant's adverse employment action, no liability for unlawful retaliation arises if the employee would have faced that discipline even without the protected conduct." *Id.* (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). *See Apache Corp.*, 627 S.W.3d at 236-237 (Texas Labor Code).

For the reasons discussed above, Maue cannot create a fact question regarding the lower "causal connection" standard. It follows logically that he cannot carry the more stringent burden of showing "but-for" causation. That is, even if the Court were to lend credence to Maue's speculation that (1) his complaints about Spanish being used in his presence, possibly to exclude him from conversations, or (2) his encouragement of other employees to take complaints to HR played a role in the termination decision, that evidence alone is insufficient to create a fact question regarding "but-for" causation. Read testified that he made the decision to terminate Maue's employment, and explained all of the factors that went into his decision. ***Even if Read knew about Maue's complaints and took them into account***, which he did not, Champion is entitled to summary judgment because Maue has no evidence that Read's did not (also) consider Maue's poor job performance and rank insubordination when making the decision. For this reason as well as those discussed above, Champion is entitled to summary judgment on Maue's retaliation claims under both state and federal law.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, Champion respectfully requests that the Court grant the Motion; enter a take-nothing judgment for Champion and against Maue on each of Maue's claims, causes of action, and requests for relief asserted herein, dismissing the same with prejudice; award

Champion its taxable costs; and grant all other relief, general or special, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

By: *\/s/ John M. Barcus*

JOHN M. BARCUS
Texas State Bar No. 24036185
john.barcus@ogletree.com
MOLLY ANN LAWRENCE
Texas State Bar No. 24083365
mollyann.lawrence@ogletree.com

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
8117 Preston Road, Ste. 500
Dallas, Texas 75225
Tel: (214) 987-3800
Fax: (214) 987-3927

**ATTORNEYS FOR DEFENDANT CHAMPION HOME BUILDERS, INC.**

## CERTIFICATE OF SERVICE

This is to certify that on May 6, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the electronic system of filing, which will transmit a Notice of Electronic Filing to the parties' counsel of record.

*/s/ Molly Ann Lawrence*
MOLLY ANN LAWRENCE