IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK MAUE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| -v- | § | Civil No. 3:23-cv-00443-K |
| | § | |
| CHAMPION HOME BUILDERS, INC. | § | |
| | § | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S
AMENDED MOTION FOR SUMMARY JUDGMENT

Now Comes Plaintiff, Mark Maue, and files this Response to Defendant's Motion for Summary Judgment, in support of which would respectfully show the Court the following.

TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

I. SUMMARY OF ARGUMENT ..... 1

II. THE FACTS ..... 1

III. THE LAW ..... 17

A. SUMMARY JUDGMENT STANDARD ..... 17

B. TCHRA STANDARD ..... 17

1. Hostile Work Environment ..... 18

2. Race/National Origin Discrimination Under TCHRA and 1981 ..... 21

a) "Language" is not the basis for Maue's claims ..... 23

b) Disparate treatment ..... 23

c) Pretext ..... 24

d) "Same actor" inapplicable ..... 32

3. Retaliation ..... 34

a) Statutorily protected activity ..... 34

b) Adverse Employment Action ..... 36

c) Causation ..... 36

d) Decision Maker's Knowledge ..... 38

e) Pretext ..... 39

C. Assault Was Forseeable ..... 39

IV. CONCLUSION ..... 41

CERTIFICATE OF SERVICE ..... 42

TABLE OF AUTHORITIES

**Cases**

*Abdallah v. Mesa Air Grp., Inc.,* 83 F.4th 1006 (5th Cir. 2023).................................................. 22
*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253 (11th Cir. 2010) .................................... 32
*Appel v. Inspire Pharmaceuticals, Inc.*, 712 F.Supp.2d 538 (N.D. Tex. 2010)........................... 24
*Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955 (5th Cir.1993)....................................................... 22
*Bosque v. Starr County, Tex.*, 630 Fed. Appx. 300 (5th Cir. 2015)...................................... 38, 39
*Bregon v. Autonation USA Corp.*, 128 Fed. Appx. 358 (5th Cir. 2005)...................................... 38
*Broderick v. Donaldson*, 437 F.3d 1226 (D.C.Cir.2006)........................................................... 34
*Brown v. Rio Petroleum, Inc.*, No. 99-11194 (5th Cir. 2001)...................................................... 31
*Burton v. Freescale Semiconductor, Inc*. 798 F.3d 222 (5th Cir. 2015)....................................... 29
*Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263 (5th Cir.1998). ................................................. 19
*City of El Paso v. Parsons*, 353 S.W.3d 215 (Tex. App.—El Paso 2011, no pet.)...................... 39
*Daigle v. Life Ins. Co.*, 70 F.3d 394 (5th Cir.1995) ...................................................................... 22
*Dickerson v. Wyeth-Ayerst Lab'ys*, No. CIV. A. 92-7075, 1993 WL 319610, at *3 (E.D. Pa. Aug. 18, 1993) ............................................................................................................................ 40
*Flanner v. Chae Inv. Servs. Corp*., 600 Fed. Appx. 914 (5th Cir. 2015)................................ 29, 30
*Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165 (5th Cir. 2014).................................. 38
*Hague v. Univ. of Tex. Health Sci. Ctr.*, 560 Fed. Appx. 328 (5th Cir. 2014).............................. 30
*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).................. 19
Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187 (10th Cir.2008)............................................. 34
*Jenkins v. Orkin Exterminating Co.*, 646 F. Supp. 1274 (E.D. Tex. 1986) ................................ 37
*Klages v. Gen. Ordnance Equip. Corp.*, 240 Pa. Super. 356, 367 A.2d 304 (1976) .................... 40
*Knoll v. Neblett,* 966 S.W.2d 622 (Tex.App.—Houston [14 th Dist.] 1998, pet. denied). ............ 40
*Lauderdale v. Texas Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157 (5th Cir. 2007). ....... 18
*Long v. Eastfield College*, 88 F.3d 300 (5th Cir. 1996)............................................................... 36
*Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005).................................................... 17
*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976) ......................................................................................................................................... 17
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973) .......................... 18, 25
*Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)....... 19
*Miller v. Eby Realty Group, LLC*, 396 F.3d 1105 (10th Cir. 2005)............................................. 32
*Mission Conol. Ind. Schoos Dist. v. Garcia*, 372 S.W.3d 629 (Tex. 2012)................................ 18
*Mitchell v. Sorenson Commc'n*, No. 3:23-CV-0185-L-BH, 2023 WL 8832813, at *3 (N.D. Tex. Dec. 1, 2023), *report and recommendation adopted*, No. 3:23-CV-185-L, 2023 WL 8851641 (N.D. Tex. Dec. 21,.................................................................................................................... 23
*Morgan v. Chao*, No. CV-16-04036-PHX-DLR, 2017 WL 3215647, at *2 (D. Ariz. July 28, 2017), aff'd, 773 F. App'x 419 (9th Cir. 2019) ............................................................................ 40
*Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967, (2024) .................................................. 19

*Patrick v. Ridge*, 394 F.3d 311 (5th Cir. 2004)........ 25
*Pegram v. Honeywell, Inc.*, 361 F.3d 272 (5th Cir. 2004)........ 22, 31, 32
*Perry v. Pediatric Inpatient Critical Care Services*, No. SA-18-CV-404-XR, 2022 WL 4456273, at *11 (W.D. Tex. Sept. 26, 2022)........ 24
*Phan Son Van v. Pena*, 990 S.W.2d 751 (Tex. 1999........ 39
*Rhodes v. Guiberson Oil Tools,* 75 F.3d 989 (5th Cir. 1996)........ 24
*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000)(collecting cases)........ 33
*Salazar v. Cargill Meat Sols. Corp.*, 628 Fed. Apppx. 241 (5th Cir. 2015)........ 31
*Sanders v. Casa View Baptist Church*, 898 F. Supp. 1169 (N.D. Tex. 1995), *aff'd,* 134 F.3d 331 (5th Cir. 1998)........ 22
*Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720 (7th Cir.2003)........ 34
*Stanton v. Jarvis Christian College*, 417 F.Supp.3d 811 (E.D. Tex. 2019)........ 30
*Tanner v. LSU Fireman Training Program*, No. 00-30966, 2001 U.S. App. LEXIS 31285, at *17-18 (5th Cir. 2001)........ 31
*Tejada v. Travis Assoc. for the Blind*, 617 Fed.Appx 325 (5th Cir. 2015)........ 37
*Texas Dept. of Assistive & Rehab. Services v. Abraham*, 03-05-00003-CV, 2006 WL 191940, at *7–8 (Tex. App.—Austin Jan. 27, 2006, no pet.)........ 39
*Texas Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920 (Tex. App. 2016)........ 22
*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981)........ 18, 24
*Travis v. City of Mesquite,* 830 S.W.2d 94 (Tex.1992)........ 40
*Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337 (5th Cir.2007)........ 34
*Young Buisson v. Bd. of Supervisors of the La. Cmty. & Tech College Sys*., 592 Fed. Appx. 237 (5th Cir. 2014)........ 29

**Statutes**

42 U.S. Code § 1981........ 22, 23
Tex. Lab. Code Ann. § 21.051(1) (West 2015)........ passim

I. SUMMARY OF ARGUMENT

The Defendant's allegations of "undisputed" facts are almost entirely disputed. Maue was harassed and discriminated against based on race by his supervisor, reported it and was fired. There was an ongoing atmosphere of discrimination that was allowed by management to continue, as attested to by Maue's coworkers. The Defendant's stated reasons for termination are overwhelmingly pretextual. The Defendant's motion should be denied in all respects.

II. THE FACTS

In the Appendix designations, "R" represents the deposition of General Manager Randy Read, "M" represents the affidavit of Mark Maue, "N" represents the deposition of Human Resources Manager Amy Newman, "F" represents the deposition of co-worker John Faulkner, "P" represents the affidavit of coworker Troy Pierce.

**Maue's Job as Assistant Production Manager**

The GM, Randy Read, had staff meetings every two weeks with his Department Managers, including the Production Manager, Juan Carlos Bocanegra. During those times, the Assistant Production Manager (APM), Maue, ran the entire production floor. (R Appx. 182:23—183:22). The job of APM was supposed to include reviewing production orders to ascertain pertinent data, inspecting manufacturing processes at various fixed and random stages to ensure code compliance, implementing best manufacturing practices to enhance quality, troubleshooting to identify unique or system wide opportunities for improvement, reviewing root cause issues and implementing changes, enforcing safety standards, maintaining disciplined housekeeping and organization standards, inspecting equipment to ensure operational performance and optimum utilization and supervising/managing departmental employees. (Appx. 247). Maue's supervisory responsibilities were supposed to include planning, assigning

and directing work, assessing performance, disciplining employees and resolving complaints/problems. *Id*.

**David Felix and the OpEx Team**

Defendant's termination of Maue hinges substantially on what David Felix, a member of Champion's OpEx team, allegedly told Randy Read during a visit to the Mansfield plant to do an assessment of ways to improve operations. Read states that one of the reasons for terminating Maue was that he interacted with the OpEx team during their visit. Yet there is an email from the OpEx team prior to the visit stating "[i]t would be good for the kick off meeting on Tuesday morning to have all production supervisors available also." (Appx. 121—122). Furthermore, Read admits that Maue's job required him to interact with the OpEx team throughout the plant. These job responsibilities require the APM to travel throughout the plant. (R Appx. 219:14—221:2). Felix's deposition testimony directly contradicts all of Read's misrepresentations about Maue and the OpEx team.

Felix is the northeast regional director of operational excellence who optimizes processes and material usage. (Fe Appx. 80:3—11). He went with a team to the Mansfield plant in February 2022 to evaluate the assembly process. (Fe Appx. 81:10—19). It was not part of his job to assess employees. (Fe Appx. 104:/9—105:1;110:14—18). Felix testified that he had no role or input into firing Maue. (Fe Appx. 82:17—23). Felix can't remember how long he was at the plant. (Fe Appx. 83:3—5). He doesn't recall who he met with on the production team when they arrived (Fe Appx. 84:19—85:7). In fact, he can't remember anything about the visit. (Fe Appx. 86:25—87:4). He knows he went to the flooring area because that is his area of expertise, but he doesn't remember if he interacted with anyone. (Fe Appx. 88:10—90:21). He typically stays in the flooring department for the entire assessment. (Fe Appx. 89:15—19). He does not

recall observing Maue performing any of his job duties. (Fe Appx. 90:23—25). He does not recall any details of any interaction with Maue. (Fe Appx. 90:12—19). In fact, he does not recall Maue saying he was unhappy. (Fe Appx. 113:8—12; 103:12—22). He told Bocanegra that there was dissension amongst his leadership team and he needed to get ahead of it before the team degrades. (Fe Appx. 101:17—23). He was talking about the leadership team "as a whole." (Fe Appx. 102:9—13). He had no opinion of Maue's performance as an Assistant Production Manager. (Fe Appx. 111:5—9). Felix can't remember how many interactions he had with Maue. (Fe Appx. 92:25—93:4). He initially testified that the only thing he can remember about his interaction with Maue is how it made him "feel." (Fe Appx. 93:8—95:1; 98:10—18). He later testified that Maue was saying that no one would listen to his ideas for improvements. (Fe Appx. 99:14—100:3). Even though Felix's purpose was to provide for improvements, and "some of the best ideas come from employees," he did not ask Maue what improvements he was offering. (Fe Appx. 100:1—19). He did nothing to determine whether it was true that Maue had good ideas that were being ignored by leadership. (Fe Appx. 105:24—106:3). The conversation lasted a matter of minutes. (Fe Appx. 101:7—12). Felix, personally, would be "bummed" if he had good ideas for improvements that were ignored by leadership. (Fe Appx. 106:10—21).

The OpEx team exit meeting with the plant managers did not include any information about Maue. (Fe Appx. 92:5—7). Felix does not recall talking with anyone other than Bocanegra about Maue. (Fe Appx. 106:22—107:3). Notably, he has no recollection of speaking to Randy Read about Maue.

Q. Okay. So you don't have a memory of
escalating anything to Mr. Read?

A. That is correct.

(Fe Appx. 118:7—9)

Felix agrees that he would want to know an employee's performance history before assessing their workplace satisfaction and he did not know Maue's. (Fe Appx. 96:4—13). He made no effort to find out Maue's work history, performance history or disciplinary history. (Fe Appx. 96:14—17). He does not recall talking to anyone else to get their opinion about Maue. (Fe Appx. 96:18—21). It was not part of his job function to assess any employee's satisfaction with their work, including Maue. (Fe Appx. 96:22—97:1). It was not his intent to have any negative impact on Maue's employment. (Fe Appx. 114:11—15; 114:25—115:4).

Q. What I'm asking you is,
you agree that the team provided negative information
about Mr. Maue to the management team at the
facility, correct?

A. That is not correct. I can't verify
anybody saying anything negative about Mr. Maue.

Q. Well, what did the team
say about Mr. Maue to the management at the facility?

A. I do not recall the team saying anything
about Mr. Maue at the facility.

(Fe Appx. 112:5—15).

**What Champion Told the TWC About Maue**

Champion represented to the Texas Workforce Commission that the reasons for Maue's termination included that "Maue demonstrated a pattern of disrespect towards other team

members and exhibited an authoritarian management style which included yelling at and minimizing others. Maue routinely spoke poorly of his colleagues.…" This is not the same as what Champion has represented in its motion for reasons for termination and is contradicted by the testimony of Maue's co-workers. There is not a single record that supports this allegation. There are many other misrepresentations in this account that are directly contradicted by OpEx team member David Felix. It states that Felix was the Team Leader, but he testified he wasn't. (Fe Appx. 108:1—7). It states that Felix asked Maue about cutting plywood a certain way, which Felix did not recall and does not know where Champion got such an allegation. (Fe Appx.108:8—13). Felix testified that it is not correct that the OpEx ("VSM") team told management that Maue was dissatisfied. (Fe Appx. 108:21—25). Felix does not remember saying that Maue was "universally negative in his comments about the plant's leaders" as represented. (Fe Appx. 109:1—7). Felix does not recall telling the Mansfield team that he wouldn't want someone like Maue on his team as represented to the TWC (and in Defendant's motion). (Fe Appx. 109:/8—11; 110:19—24). Felix does not recall saying anything at all about Maue's performance as represented. (Fe Appx. 111:21—112:4). He does not recall the "team" saying <u>anything</u> about Mr. Maue at the facility. (Fe Appx. 112:12—15). Regarding the representation by Defendant that "[f]ollowing receipt of the VSM team's feedback regarding Maue, Champion decided to end Maue's employment effective February 18th," Felix's response is that he was not aware that the VSM team did or said <u>anything</u> about Maue. (Fe Appx. 116:17—117:8)

**<u>Maue Good Worker, Respectful</u>**

John Faulkner was in Quality Control at Champion when Maue was APM. Faulkner never saw Maue be disrespectful to anyone. (F Appx. 44:6—15). He never heard Maue yell at

or minimize anyone. (F Appx. 44:16—18). Faulkner says Maue "absolutely" was not bent on tearing people down rather than building them up. (F Appx. 44:23—45:1). He never heard a single complaint about Maue being mean to anyone or even raising his voice. (F Appx. 45:2—6). Troy Pierce, a coworker at Champion, knew Mark Maue when he worked at Champion. (P Appx. 172). Pierce says Maue was a hard worker and offered ways to improve work processes. *Id.* Pierce never heard him be disrespectful to anyone or yell at anyone. *Id.*

**Language Used to Exclude/Impede White Employees, Including Maue**

Juan Carlos Bocanegra is Hispanic. (N Appx. 140:2—6). The managers that reported to Bocanegra (and supposedly to Maue) are bilingual, including "Chato." (N Appx. 136:10—12; 138:24—139:10). None of the managers are Spanish speaking only. (N Appx. 137:16—18). Faulkner observed Bocanegra and Chato having a conversation in English and as soon as they saw Mark, they switched to Spanish. (F Appx. 2:—3:2). Faulkner testified that it was obvious that Bocanegra didn't want Mau there. They could hear that Bocanegra was conducting the plant meetings entirely in Spanish and Maue did not speak Spanish. (F Appx. 30:23—31:19). Even if they were pointing at Faulkner and you could tell they were talking about him in Spanish, nobody translated what was being said. (F Appx. 31:20—32:4).

Faulkner supervised Tanner Kelly. Kelly was frequently communicating in Spanish on the radio. (F Appx. 52:12—56:10). Faulkner told Kelly he applauded him learning Spanish but not to speak it on the radio because Faulkner didn't speak Spanish and needed to understand what was being communicated. *Id.* Everyone who had a radio spoke English. (F Appx. 56:13—57:15). Faulkner told Kelly he was free to have conversations in Spanish at the workplace, just not on the radio. (F Appx. 69:21—71:25). Bocanegra and Newman completely mischaracterized Faulkner's instruction to Kelly. (F Appx. 72:1—17). Josh Satterwhite, another

manager with Champion, would also complain to Faulkner about Bocanegra holding meetings in Spanish and then Satterwhite would later be chastised for not knowing what was going on. (F Appx. 65:18—66:7). Troy Pierce understood a little Spanish but is not fluent. (P Appx. 172). Speaking Spanish on the radios interfered with non-Spanish speakers' ability to do their jobs. *Id*. If you asked for a translation, often you would be told something that was clearly not an exact translation. *Id*.

Maue was English speaking and not bilingual. (M Appx. 240). He had no problem with others speaking Spanish in the workplace. *Id*. In fact, Maue made efforts to learn Spanish while at Champion. *Id.* However, Bocanegra conducted the manager meetings (managers that Maue was supposed to be supervising) in Spanish without interpretation that Maue did not understand. *Id*. On one occasion when Maue asked for Bocanegra to translate, he disregarded Maue's request and told him "they're just the same as before." *Id*. That response made no sense as each meeting was unique and addressed different issues. *Id*. It was clear to Maue that Bocanegra was not going to include him in those discussions. *Id*. There were times when Bocanegra would be speaking English to a manager until Maue approached and then he would switch to Spanish so that it intentionally excluded Maue from the conversation. *Id*. On several occasions, he joined a conversation Maue was having with a manager and converted it to Spanish. For example, Maue was speaking to department manager Sergio Enriquez about a problem with a chassis that was just delivered and they radioed for Bocanegra. *Id* Upon Bocanegra's arrival, he converted the conversation to Spanish. *Id* At the end of the discussion, he instructed Maue to go to another department without informing Maue of the solution. *Id* This undermined Maue's relationship with the managers as they would seek to have Bocanegra intervene in any discussions where they were addressing issues in their area. *Id*

**Bocanegra Demeaned Maue, Set Him Up**

Bocanegra would give Maue menial tasks, including working on the assembly line, which was not in his job description. (M Appx. 241). It was not done to train Maue, as he already knew how to work the assembly line. *Id*. Bocanegra assigned Maue menial tasks outside of his job description almost daily. *Id*. For instance, Bocanegra told Maue that he wanted Maue building walls rather than performing the Assistant Production Supervisor responsibilities. *Id*. Putting Maue building walls was not for training purposes as Maue had previously worked in that department and already knew the process. *Id*. Maue became very frustrated by Bocanegra refusing to allow him to perform the APM job duties and instructing him to perform manual, non-supervisory tasks almost daily. (M Appx. 242). Maue was required by Bocanegra to work on the assembly line at least three days a week. Bocanegra also required Maue to build walls and staircases, assemble HVAC components, paint, replace deck boards, and work in the trim department installing trim. This effectively placed Maue under the supervision of the managers that he was supposed to supervise and had a very negative effect on Maue's authority over the managers. *Id.* Maue went to both Randy Read, GM and Amy Newman, HR for help but was brushed off. Neither did anything to address the problem, but both were on notice that Bocanegra was not allowing Maue to perform his job. *Id*.

Faulkner witnessed an occasion where a Vice President walked up to Maue working on the assembly line and said "aren't you a production manager?" Maue said "yes sir, this is what I was told to do." The VP then said "If you're going to be working on the line, we don't need you as an APM." (F Appx. 3:4—4:3). Bocanegra forced Maue to work on the assembly line even after the VP threatened Maue's job as Assistant Production Manager if he continued to work on the assembly line. (F Appx. 41:2—11).

It was the job of the Assistant Production Manager to oversee all of the supervisors in all of the departments. (F Appx. 37:5—38:24). There is no way to do that and remain in one area. Faulkner observed Bocanegra sidelining Maue instead of allowing him to do his job as Assistant Production Manager. (F Appx. 38:25—40:22). Faulkner observed that Bocanegra was not receptive to suggestions from white employees, including Maue. (F Appx. 5:24—7:16). Maue attempted to implement ideas for better production, such as a process to ensure managers signed off on a document indicating that the work in their department had been completed. (M Appx. 240-241). However, Bocanegra never implemented the process. *Id*.

Read admits that assigning someone to belittling or demeaning tasks can be a sign of retaliation. (R Appx. 222:8—16).

**White Employees Differently Than Hispanic**

According to Faulkner, the Hispanic managers were allowed to go into other areas of the plant as needed. (F Appx. 43:5—17). Maue verifies that most of the department managers were Hispanic and they were freely allowed to go into areas of the plant outside of their departments. (M Appx. 243).

Faulkner provides specific examples of different treatment of white versus Hispanic employees. (F Appx. 13:19—16:19). For example, Faulkner saw Chato, manager over exteriors, drive over a stack of eight wood doors on a tractor without consequence whereas Faulkner was chastised by Bocanegra for a broken tile on a wall. *Id*.

Read allowed Bocanegra free reign over production. Faulkner provides a very detailed description of an incident between Bocanegra and John Hinson from Quality Control. (F Appx. 8:4—12:17). Hinson stopped a house on the production line because it wasn't ready (which was his job) and Bocanegra told the employees to "roll" the house anyway. *Id*. The two squared off

and Bocanegra doubled up his fist to hit Hinson. *Id*. Read came down and stopped the conflict, but allowed the house to roll without being complete as desired by Bocanegra. *Id*. It was clear to everyone that Juan Carlos was running the plant and blatantly favored the Hispanic workers, especially after he got away with threatening John Hinson. (F Appx. 35:21—36:21). There was another incident where a Hispanic worker was working on top of a house without a harness. Hinson reported it to safety over the radio and was chastised by Bocanegra and told it was none of his business. (F Appx. 58:2—59:2). Faulkner observed another instance where Hispanic production employees were standing on a porch of a house on the production line telling Hinson they were going to "whip his white ass" and that he was a "piece of shit" but it was Hinson that was blamed for cursing and chastised. (F Appx. 17:10—18:13).

According to Faulkner, if you were white or black, you would experience discrimination at that facility. (F Appx. 46:1—47:21). Faulkner says that Maue's termination sent a message to everyone that if you complain about the discrimination, you will be terminated. (F Appx. 48:14—49:17). Faulkner believes that he was fired in part because he opposed Bocanegra's favoritism based on race. (F Appx. 50:23—51:2).

According to Champion ex-employee Troy Pierce, Mr. Bocanegra favored Hispanic employees over white employees and would hire and promote less qualified Hispanic employees over white employees. (P Appx. 171). Pierce had experience in home building and had been a superintendent for a custom home builder. However, Mr. Bocanegra passed him over for promotion and would not put him in a leadership position. (P Appx. 171).

**<u>Complaints of Bocanegra's Discriminatory Treatment</u>**

Faulkner and Maue regularly talked about the racism at Champion. (F Appx. 60:11—61:2). Maue told Faulkner that he was going to HR and talk to Amy Newman (HR Manager)

about it. *Id*. Maue was in Newman's office daily related to reporting about attendance and he told her many times about Bocanegra's discrimination/harassment, specifically saying "this is racial harassment and I can't do my job" when Bocanegra intentionally excluded Maue from conversations with those Maue was to manage, belittled and demeaned him and refused to allow Maue to perform the job he was hired for. (M Appx. 242). Approximately a month and a half after Maue was hired to be APM, he told Newman about the time Bocanegra excluded him from a conversation with a department manager about solving a problem and he told her that he felt Bocanegra was discriminating against him because of his race. *Id*. After approximately Maue's third complaint that Bocanegra was intentionally discriminating, Newman told him that he was not the only one to make this complaint and she told Maue to go and tell Read about it. (M Appx. 242-43). Maue went to Read's office and repeated that Bocanegra was discriminating against him based on race. *Id*. Read responded that he did not believe it was discrimination but he would check into it. *Id*. Maue never heard anything further from him. *Id*. The last time Maue complained to Newman about discrimination by Bocanegra was on February 15, 2022. (M Appx. 243). Bocanegra was introducing the department managers to the OpEx team by name and department. When he got to Maue, he very dismissively said "this is the Assistant Production Manager" and omitted Maue's name. *Id* While it may sound relatively innocuous, it was representative of the way Bocanegra treated Maue and how dismissive Bocanegra was of Maue. *Id.* He did not treat any of his Hispanic managers this way. *Id.* Maue reported this to Newman on that day as another example of Bocanegra's ongoing discrimination. *Id.*

Newman testified that she was aware that Maue had a complaint of discrimination:

Q. Has any supervisor shared with you that an
employee had complained about discrimination?

A. Yes.

Q. And who has shared that with you?

A. John Hinson shared with me that Mr. Maue believed he was being discriminated against.

(N Appx. 141:12—23)

That was reported to her in October 2021 (N Appx. 141:24—142:1). Allegedly, Mr. Hinson said the discrimination complaint related to employees speaking Spanish on the radio. (N Appx. 142:2—5). Since Newman was aware that Maue had a complaint of discrimination, she would necessarily have had to interview him and document it. (N Appx. 142:18—143:4). She did not do that. *Id*. Newman admits that employees don't have to put discrimination complaints in writing before she is obligated to investigate them but she did not ask Maue about his complaint of discrimination or investigate it. (N Appx. 147:6—13; 148:5—15). Newman also admits that Maue told her that he had a complaint that was related to Bocanegra underutilizing him in his role. (N Appx. 143:5—25). She also did not document that discussion or interview Bocanegra. *Id*. She performed no documented investigations of Maue's concerns about discrimination in the workplace. (N Appx. 144:6—10). In fact, she never addressed any of Maue's concerns with Bocanegra. (N Appx. 145:11—17).

There were numerous other employees that complained to Faulkner about Bocanegra discriminating. (F Appx. 19:22—22:19). Faulkner went to Amy Newman in HR to complain about Bocanegra "more times than [he could] count." (F Appx. 23:8—10). Faulkner "repeatedly" told Newman that there was race discrimination ongoing by Bocanegra (at least ten times F Appx. 26:15). (F Appx. 24:23—25:13). Faulkner reported to HR concerns about race discrimination toward himself as well as others. (F Appx. 62:2—13). HR did not take his

concerns seriously. (F Appx. 62:14—63:4). Faulkner told Randy Read that the racism and favoritism was "ridiculous." (F Appx. 63: 5—64:12). Read's only response was that he didn't see it that way. *Id*. Newman told Faulkner "if you want to work at Champion you have to play ball" with Bocanegra. Randy Read was there at the time. (F Appx. 24:8—20; 62:14—63:4). Faulkner believed that his reports of discrimination to Newman were part of why they set him up for termination. (F Appx. 25:11—18)

On one occasion, Faulkner had a meeting with HR and the General Manager and in that meeting the GM asked how can we make the plant better? Faulkner said "stop the racism." (F Appx. 27:11—28:4). On another occasion, Faulkner was having a conversation with a Vice President, David Seales, where they were discussing the plant. (F Appx. 33:19—34:17). Seales looked at Faulkner and said "if the damn racism at this f'ing plant does not stop, I will go down there and clean out [Bocanegra's] office myself." *Id*.

Champion employee Kenny Briley also went to HR about the workplace race discrimination. (F Appx. 29:10—18). Champion employee Terrell Page filed an EEOC Charge of discrimination stating that Bocanegra discriminated against him and harassed him "due to the color of [his] skin." (Appx. 248-253). Page stated that "most of the people in supervisor positions are Mexican and pretty much everyone that is not has either been fired or removed from a team leader supervisor position and replaced." *Id*.

After Maue was gone, Faulkner said to Newman we all know he will win because the racism here is so blatant and she said "white people can't sue for discrimination. White people are not going to win a suit, so we don't care. Let him." (F Appx. 32:11—33:14).

**The Pretextual Termination**

The Defendant alleges that Read made the decision to terminate Maue, but the termination document is signed only by Bocanegra. (Appx. 170). Bocanegra is the one that approved the termination document. (R Appx.191:3—23). Read testified that it was he, HR and Bocanegra that discussed their allegation that Maue was not following instructions on the day of termination. (R Appx. 192:19—193:15). He doesn't recall what Maue was doing at the time and he had not spoken to Maue that day. (R Appx. 194:4—13). Nobody suggested calling Maue in to address it with him but they all agreed to fire him. (R Appx. 194:21—195:2). Read alleges that Bocanegra had instructed Maue to be the manager of the roof building department but Read was not present for such alleged instruction. (R Appx. 195:11—25). Read is not aware of when the instruction was allegedly given. (R Appx. 196:5—7).

Read alleges that on the day Maue was allegedly supposed to be supervising the roofing department, he was spending "a lot of time" talking to the OpEx team. (R Appx. 197:15—17). However, David Felix, on the OpEx team, testified that he could only remember one conversation that lasted "minutes." (Appx. 101:7-12). Read can't identify anyone other than Felix that he saw Maue talking to. (R Appx. 201:22—24). Read does not know what was being discussed or who initiated the conversation. (R Appx. 198:2—19). Read admitted that it would not be unusual for the OpEx people to talk to the Assistant Production Manager on the floor. (R Appx. 199:13—16). Read never asked Maue what he talked to the OpEx people about. (R Appx. 200:12—14). Read saw the OpEx people talking to other supervisors and employees as well. (R Appx. 202:6—8). While OpEx was there, there were meetings going on that involved Bocanegra and Read. (R Appx. 202:21—204:11). Read admits that one of the points of having

an Assistant Production Manager was to have him overseeing the production processes when the Production Manager is otherwise occupied. (R Appx. 204:21—205:3).

Read admits that he was trained to document reasons for his actions so that he doesn't get accused of retaliation. (R Appx. 186:4—15). Read admits that they have progressive discipline and if conduct can be fixed, they should give an employee a chance to fix it. (R Appx. 187:10—23). There are no documented deficiencies of Maue. (R Appx. 187:24—188:4). Champion has zero documentation of any complaint or issue with Maue. (R Appx. 188:9—189:3; 190:20—42/2; 214:21—24). In fact, the only documentation Champion has regarding Maue's performance is in his Performance Evaluation prior to performing as Assistant Production Manager (Appx. 169). The Performance Evaluation gave him satisfactory marks in dedication, performance, cooperation, communication, teamwork, character, and responsiveness. He did not receive a single mark for "unsatisfactory" in any category.

Read alleges that Felix, on the OpEx team, approached him and said Maue was pursuing them constantly and he wouldn't have him on his team. (R Appx. 212:25—213:8). This is directly contradicted by the testimony of Felix. (Fe Appx. 109:8—11; 110:19—24). Read alleges that Felix told him Maue was talking poorly about Bocanegra, Read and the facility in general. (R Appx. 217:24—218:15). This is directly contradicted by Felix, who testified that he had no memory of any discussion with Read about Maue and that the only thing Maue told him was that nobody would listen to his ideas for improvements. (Fe Appx. 118:7-9; 90:12—19; 99:14—100:3). Read alleges that Felix was the only one on the OpEx team that mentioned Maue to him. (R Appx. 215:11—13). Read did not know Felix had never met him before. (R Appx. 216:4—10).

Read admits that Maue never told Read he was unhappy at or about work. (R Appx. 224:2—11). Read alleges there were three things that allegedly made him believe Maue was "unhappy" at work: he didn't like monitoring time cards, he wanted everyone to speak English and the conversation with Felix. (R Appx. 228:2—7). However, Felix denies speaking to Read or saying Maue was unhappy with work. (Appx. 113:8-12; 103:12-22). Even Newman admits that Maue was not trying to ban Spanish in the workplace. (Appx. 146:12-17). And Read didn't ask Maue about any of them. (R Appx. 228:8—15). Read admits that Maue had never been untruthful, was never disrespectful, never refused to cooperate with Read, never refused to follow Read's instructions and never told Read he was unhappy. (R Appx. 229:7—17).

According to HR, Maue was fired for insubordination (N Appx. 149:20—150:6). Newman alleges that Maue was given a direct job duty for the day in a specific area but would not stay in that area. (N Appx. 150:1—6). There is no documentation of this and she did not investigate it. (N Appx. 150:7—13). She did not get Maue's side of the story. (N Appx. 151:6—24). No one got Maue's side of the story. (N Appx. 151:22—24). She did nothing to advocate for Maue regarding his termination. (N Appx. 152:23—153:1). She didn't look at his job description, she didn't check to see if other supervisors left their areas, she didn't check to see how Bocanegra treated other supervisors who left their areas, she did not compare his treatment with that of other supervisors. (N Appx. 154:16—155:18).

**Ramirez Treated Differently**

Read alleges he "terminated" Daniel Ramirez, the Hispanic roof build manager, for insubordination for lying about a situation where material was damaged. (R Appx. 20619—207:9). However, Mr. Ramirez was transferred to the Burleson facility because Read called them for that purpose. (R Appx. 208:25—211:5). Read did not make the same phone call for

Maue. (R Appx. 211:6—8). There is a long list of reasons for Ramirez's termination, including lying to Randy Read. (Appx. 233). Read transferred Ramirez to another facility with the same salary. (Appx. 129). According to the Defendant, Maue was performing Ramirez's job at the time of Maue's termination—the exact job of roof build manager. His alleged infractions were arguably much less than Ramirez's yet he was not transferred.

## III. THE LAW

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." In making this determination, "we view the evidence and all factual inferences from that evidence in the light most favorable to the party opposing the motion and all reasonable doubts about the facts are resolved in favor of the nonmoving litigant." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 349 (5th Cir. 2005)

### B. TCHRA STANDARD

Section 21.051 of the TCHRA provides that an employer commits an unlawful employment practice if it fails or refuses to hire, discharges, or otherwise discriminates in any manner against an employee in connection with compensation or the terms, conditions, or privileges of employment because of the employee's race, color, disability, religion, sex, national origin, or age. Tex. Lab. Code Ann. § 21.051(1) (West 2015). "[The U.S. Supreme Court] has never wavered in [the] understanding that Title VII prohibits *all* racial discrimination in employment, without exception for any group of particular employees." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283, 96 S. Ct. 2574, 2580, 49 L. Ed. 2d 493 (1976)(emphasis in

original). Thus, Mark Maue, white, is entitled to the protections against discrimination, harassment and retaliation.

A TCHRA plaintiff can prove discrimination by either direct or circumstantial evidence. *Mission Consol. Ind. Sch Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). "The first method, rather straightforward, involves proving discriminatory intent via direct evidence of what the defendant did and said." *Id.* But because direct evidence of discrimination is often "hard to come by," the plaintiff can also rely on circumstantial evidence using "the burden-shifting mechanism of *McDonnell Douglas*." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973) ). "Under this framework, the plaintiff is entitled to a presumption of discrimination if he meets the 'minimal' initial burden of establishing a prima facie case of discrimination."[3] *Id.* "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is not onerous." *Garcia*, 372 S.W.3d at 634 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981) ).

1. Hostile Work Environment

A plaintiff may establish a TCHRA violation based on race/national origin discrimination creating a hostile work environment. The only issue is whether Arthur's behavior created a hostile or abusive working environment. Where the claim of harassment is against a supervisor, there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a "term, condition, or privilege" of employment. *Lauderdale v. Texas Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 162–63 (5th Cir. 2007). For harassment on the basis of race/national origin to affect a term,

condition, or privilege of employment, as required to support a hostile work environment claim under TCHRA, it must be " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993), *quoting, Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A recent decision out of the United States Supreme Court is informative regarding discrimination resulting in a change in an employment term or condition. In *Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967, 976–77 (2024), a woman brought suit for sex discrimination because of a transfer in job responsibilities. The Court found that a plaintiff need only "show some harm respecting an identifiable term or condition of employment." *Id*. at 974. A plaintiff need show only "some injury" respecting their employment terms or conditions. *Id*. at 977. In *Muldrow*, the Court found that a change in responsibilities and schedule met the standard for a discrimination claim.

In determining whether an environment is hostile or abusive, the court must look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; ... whether it unreasonably interferes with an employee's work performance," *Harris,* 510 U.S. at 23, 114 S.Ct. 367, and "whether the complained of conduct undermined the plaintiff's workplace competence," *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 270 (5th Cir.1998).

Bocanegra harassed Maue on a daily basis. (M Appx. 240-42). He held the daily manager meetings (the managers that Maue was allegedly supposed to supervise) entirely in Spanish with no translation. *Id*. There were times when Bocanegra would be speaking English to a supervisor until Maue approached and then he would switch to Spanish so that it intentionally excluded Maue from the conversation. (M Appx. 240). On numerous occasions,

Bocanegra joined a conversation Maue was having with a manager and converted it to Spanish. For example, Maue was speaking to department manager Sergio Enriquez about a problem with a chassis that was just delivered and they radioed for Bocanegra. *Id.* Upon Bocanegra's arrival, he converted the conversation to Spanish. At the end of the discussion, he instructed Maue to go to another department without informing him of the solution. *Id.* This had an adverse effect on Maue's relationship with the managers as they would seek to have Bocanegra intervene in any discussions where they were addressing issues in the managers' area. *Id.* The role of Assistant Production Manager was a supervisory role. (Appx. 247). It included reviewing production orders to ascertain pertinent data, inspecting manufacturing processes at various fixed and random stages to ensure code compliance, implementing best manufacturing practices to enhance quality, troubleshooting to identify unique or system wide opportunities for improvement, reviewing root cause issues and implementing changes, enforcing safety standards, maintaining disciplined housekeeping and organization standards, inspecting equipment to ensure operational performance and optimum utilization and supervising/managing departmental employees. Maue's supervisory responsibilities were supposed to include planning, assigning and directing work, assessing performance, disciplining employees and resolving complaints/problems. A true and correct copy of the job description is attached to Maue's affidavit. (Appx. 247). This job description is a corporate job description for Maue's position. Maue asked Mr. Bocanegra repeatedly for his job description, but Bocanegra would not give it to him. (M Appx. 241). Maue had to obtain it surreptitiously. *Id.* Instead of allowing Maue to fulfill the role as set forth in the corporate job description, Bocanegra intentionally made Maue perform belittling and demeaning tasks that were not in keeping with Maue's role on a daily basis. *Id.* For instance, he would make Maue work on the assembly line. *Id.* It was not done so that Maue would learn the

process as Maue already knew the process. *Id.* Maue would show up to work in professional attire suited to a supervisory position and Bocanegra would put him in a non-supervisory position that was dirty, messy and ruined his clothes. *Id.* These actions were not for training purposes as Maue already knew how to perform the assembly tasks. *Id.* In fact, on one occasion a VP of Champion was visiting the plant at a time when Bocanegra had made Maue work on the assembly line. *Id.* The VP asked Maue why, if he was an Assistant Production Manager, he was working on the assembly line—a job clearly not within the APM role. *Id.* Despite the fact that Maue told the VP he had been assigned to do so, the VP stated that if Maue continued to do so, he would no longer be an APM. *Id.* Maue was required by Bocanegra to work on the assembly line at least three days a week. *Id.* Bocanegra also required Maue to build walls and staircases, assemble HVAC components, paint, replace deck boards, and work in the trim department installing trim on an ongoing basis. (M Appx. 241-42). This effectively placed Maue under the supervision of the managers that he was supposed to supervise and had a very negative effect on Maue's authority over them. (M Appx. 242). Apparently, Bocanegra then complained to Read that Maue was not developing his "supervisor" role as Defendant asserted. Bocanegra told Maue to supervise the entire production process while he, Bocanegra, was in meeting with the OpEx team and then reported to Read that he, Bocanegra, had instructed Maue not to leave the roofing department, which was not true. Bocanegra harassed Maue and set him up to be fired.

2. Race/National Origin Discrimination Under TCHRA and 1981

An important omission from the Defendant's recitation of the elements of a *prima facie* case of discrimination is that the fourth prong can be established by showing that an employee was otherwise discharged because of his race. "A plaintiff makes out a *prima facie* case of race/national origin discrimination by proving: 1) he was discharged; 2) he was qualified for the

position; 3) he was within the protected class at the time of discharge; and 4) he was replaced by someone outside the protected class, "**or otherwise"** discharged because of his race. *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993)(emphasis added). *Sanders v. Casa View Baptist Church*, 898 F. Supp. 1169, 1180 (N.D. Tex. 1995), *aff'd,* 134 F.3d 331 (5th Cir. 1998) (see also *Texas Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920, 924 (Tex. App. 2016) holding that the same is true under the Texas Commission on Human Rights Act)). In some cases, however, a plaintiff may establish a prima facie case by relying on proof of disparate treatment when an employee suffers an adverse employment action for what appears to be good cause. To establish a claim of disparate treatment, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) non-protected class employees were not treated similarly. *See Daigle v. Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995).

Disparate treatment can be shown by comparing one person's experience to that of a person without the protected trait. But it can also be shown if, but for that person's protected trait, the outcome would have been different. *Abdallah v. Mesa Air Grp., Inc.,* 83 F.4th 1006 (5th Cir. 2023). However, even if a plaintiff was not terminated, a demotion in duties, even if not accompanied by a change in title or pay reduction, may constitute an adverse employment action. *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004).

Section 1981 forbids discrimination on the basis of race in making or enforcing a contract, including an employment contract. 42 U.S.C. § 1981. "Claims of racial discrimination brought under § 1981 are governed by the same substantive legal standards and evidentiary framework applicable to discrimination claims brought under Title VII." *Mitchell v. Sorenson Commc'n*, No. 3:23-CV-0185-L-BH, 2023 WL 8832813, at *3 (N.D. Tex. Dec. 1, 2023), *report and*

*recommendation adopted*, No. 3:23-CV-185-L, 2023 WL 8851641 (N.D. Tex. Dec. 21, 2023).

The same analyses apply to Maue's 42 U.S.C. § 1981 claims as apply to his TCHRA claims.

There is no dispute that Mr. Maue was discharged. Defendant does not dispute that he was qualified for the position. There is no dispute that race/national origin is a protected class. The issue, then, is whether he was "otherwise" discriminated against because of his race/national origin—disparate treatment.

a) "Language" is not the basis for Maue's claims

Mr. Maue is not claiming discrimination based on the use of language. He does assert, however, that the use of language to intentionally exclude him from necessary communications, especially by Bocanegra, is evidence of Bocanegra's attitude toward him versus the Hispanic employees at the facility. It is also evidence of how Bocanegra interfered with Maue's ability to do his job and his ability to communicate with the department managers. For instance, there were times when Bocanegra would be speaking to an Hispanic manager in English but when he saw Maue approaching, they would switch to Spanish to exclude Maue from the conversation. (M Appx. 240). This was witnessed by John Faulkner. (F Appx. 30:23—31:19). These were the managers that Maue was supposed to be supervising but was prevented from doing so in numerous ways, one of them being communications excluding Maue.

b) Disparate treatment

Read alleges he "terminated" Daniel Ramirez, the Hispanic roof build manager, for insubordination for lying about a situation where material was damaged. (R Appx. 20619—207:9). However, Mr. Ramirez was transferred to the Burleson facility because Read called them for that purpose. (R Appx. 208:25—211:5). Read did not make the same phone call for

Maue. (R Appx. 211:6—8). There is a long list of reasons for Ramirez's termination, including lying to Randy Read. (Appx. 233). Read transferred Ramirez to another facility with the same salary. (Appx. 129). According to the Defendant, Maue was performing Ramirez's job at the time of Maue's termination—the exact job of roof build manager. His alleged infractions were arguably much less than Ramirez's yet he was not transferred.

c) Pretext

The factfinder may rely on all the evidence in the record to draw this inference of discrimination. "In tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir. 1996); *Appel v. Inspire Pharmaceuticals, Inc*., 712 F.Supp.2d 538, 544 (N.D. Tex. 2010). Thus, a jury issue will be presented and a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether the employer's stated reason was what actually motivated the employer and (2) creates a reasonable inference that the protected category (age or gender) was a motivating factor in the actions of which plaintiff complains. *Id*.

i. Defendant's alleged reasons are on page 15-16 of its motion: failure to connect with the employees; behavior during OpEx visit; input from David Felix; insubordination regarding staying in the roof build department; and that Read perceived Maue was "unhappy." In order to meet its burden, Patriot must provide both "clear and reasonably specific reasons" for its actions. *Perry v. Pediatric Inpatient Critical Care Services*, No. SA-18-CV-404-XR, 2022 WL 4456273, at *11 (W.D. Tex. Sept. 26, 2022) (citing *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). "[A] defendant employer must articulate in some detail a more specific

reason than its own vague and conclusional feeling about the employee." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) ("We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement ... is not specific enough to meet a defendant employer's burden of production under *McDonnell Douglas*. It is, at bottom, a nonreason."). It should be noted regarding all of the allegations in the motion that Maue was never warned, counseled or disciplined for any reason, much less the things alleged by Defendants. (M Appx. 243). It should also be noted that the only reason give Maue when he was fired was that he was unhappy at work.

**Allegation Not Connecting With Employees Assigned to Work for Him**

Stating that Maue allegedly wasn't "connecting" with employees assigned to work for him is nonspecific and a nonreason. There is really no way to know what it even means. Furthermore, Maue explains that he was frequently assigned by Bocanegra to do menial and non-supervisory tasks from the very beginning, preventing him from engaging as a supervisor. (M Appx. 240-43). In fact, when Bocanegra assigned Maue the manual tasks as outlined in Maue's affidavit, that put Maue in the position of being supervised by the managers he was supposed to be supervising. (M Appx. 242). On one occasion when Bocanegra had assigned Maue to work on the assembly line, a VP told Maue that if he continued in that role, he would lose his position as APM. (M Appx. 241). Bocanegra would communicate in Spanish with the managers that Maue was supposed to be supervising and exclude Maue from the communications. (M Appx. 238). Bocanegra interfered with Maue's ability to supervise and that was known to HR and Read through Maue's complaints. (M Appx. 242-43). Maue implemented a new procedure to ensure managers signed off on a document indicating that the work in their department had been

completed. (M Appx. 243-44). Bocanegra had a meeting of the department managers allegedly to address the process but the department managers never followed the new procedure. *Id*.

**<u>Allegation of Maue's "Behavior" During the OpEx Visit</u>**

Regarding Maue's alleged "behavior" during the OpEx visit, it is also unsupported. Read admits that Maue's job required him to interact with the OpEx team throughout the plant. These job responsibilities require the APM to travel throughout the plant. (R Appx. 219:14—221:2). Read alleges that on the day Maue was allegedly supposed to be supervising the roofing department, he was spending "a lot of time" talking to the OpEx team. (R Appx. 197:15—17). However, David Felix, on the OpEx team, testified that he could only remember one conversation that lasted "minutes." (Appx. 101:7-12). Read can't identify anyone other than Felix that he saw Maue talking to. (R Appx. 201:22—24). Read does not know what was being discussed or who initiated the conversation. (R Appx. 198:2—19). It would not be unusual for the OpEx people to talk to the Assistant Production Manager on the floor. (R Appx. 199:13—16). Read never asked Maue what he talked to the OpEx people about. (R Appx. 200:12—14). Read saw the OpEx people talking to other supervisors and employees as well. (R Appx. 202:6—8). While OpEx was there, there were meetings going on that involved Bocanegra and Read. (R Appx. 202:21—204:11). One of the points of having an Assistant Production Manager was to have him overseeing the production processes when the Production Manager is otherwise occupied. (R Appx. 204:21—205:3). This was not a reason given to Maue at his termination.

**<u>Allegation that Maue Was Unhappy</u>**

Regarding Maue being "unhappy," it is yet another nonspecific, nonreason. Read admits that Maue never told Read he was unhappy at or about work. (R Appx. 224:2—11). Read alleges there were three things that allegedly made him believe Maue was "unhappy" at work:

he didn't like monitoring time cards, he wanted everyone to speak English and the conversation with Felix. (R Appx. 228:2—7). However, Felix denies speaking to Read or saying Maue was unhappy with work. (Appx. 113:8-12; 103:12-22). Even Newman admits that Maue was not trying to ban Spanish in the workplace. (Appx. 146:12-17). And Read didn't ask Maue about any of the alleged reasons. (R Appx. 228:8—15). Read admits that Maue had never been untruthful, was never disrespectful, never refused to cooperate with Read, never refused to follow Read's instructions and never told Read he was unhappy. (R Appx. 229:7—17). Maue loved his position as APM and enjoyed the tasks he was supposed to be performing. (M. Appx. 243). His only discontent was the discrimination and harassment by Bocanegra. *Id*.

**<u>Allegation That David Felix Said Wouldn't Have Him on Team</u>**

Felix does not recall any details of any interaction with Maue during the OpEx visit. (Fe Appx. 90:12—19). In fact, he does not recall Maue saying he was unhappy. (Fe Appx. 113:8—12; 103:12—22). He testified that the only thing he remembered Maue saying was that no one would listen to his ideas for improvements. (Fe Appx. 99:14—100:3). Felix has no recollection of ever discussing Maue with Randy Read. (Fe Appx. 118:7—9). There was nothing negative about Maue provided by the OpEx team. (Fe Appx. 112:5—15). Maue was not addressed at all in the team's exit meeting with management. (Fe Appx. 92:5—7). Felix contradicted every assertion by Randy Read.

**<u>Allegation that Maue Was Insubordinate In Leaving Roofing Area</u>**

On the date that Defendant alleges Maue was instructed to stay in the roof build area and did not, the OpEx team was at the facility to observe processes and have meetings with the supervisors, including Maue, according to the team's email. (Appx. 121-122). They needed Bocanegra and Read to be available for meetings, questions and discussions. *Id*. One of the

main purposes of having an Assistant Production Supervisor was to fill in for the Production Supervisor as necessary to supervise the production operations at the plant and Bocanegra had told Maue to supervise the entire operations while he was in OpEx meetings. (M Appx. 244). Maue was not instructed that he could not leave the roof build area and such an instruction would make no sense considering Bocanegra's unavailability. (M Appx. 244). Additionally, the managers of the build areas frequently went to other areas in the plant for various reasons, such as their department had made a mistake that was found down the production line. (M Appx. 244). Read alleges that Bocanegra had instructed Maue to be the manager of the roof building department but Read was not present for such alleged instruction. (R Appx. 195:11—25). Read is not aware of when the instruction was allegedly given. (R Appx. 196:5—7). Finally, this was not a reason given to Maue when he was fired.

**Allegation Regarding Maue Picking Up Screws and Nails in Parking Lot and Quality Control**

These were not on the list of reasons for terminating but were addressed in Defendant's facts. Maue did use a magnet to remove nails and screws off the ground as Read observed. (M Appx. 241). The facility was making room to park completed units and trying to reduce tire damage. *Id*. The final trim department was trying to move units outside, and the production line was at a halt because of the issues outside. *Id*. Maue jumped in briefly so that production could continue. *Id*. He used a rolling magnet and spent approximately five minutes doing so. *Id*. Maue was not told at any time that it was inappropriate or chastised in any way for doing so. *Id*. Read now also complains that Maue spent time in Quality Control where Hinson was. However, Quality Control is also where Champion kept the drawing and specification manuals applicable

to the production process and it was necessary for Maue to go into that area when he needed to review those manuals. (M Appx. 245).

ii. The following are all evidence of pretext:

- Evidence of satisfactory performance. *Young Buisson v. Bd. of Supervisors of the La. Cmty. & Tech College Sys*., 592 Fed. Appx. 237 (5th Cir. 2014).

Read thought so much of Maue's performance at Champion that he promoted him to APM. Maue had received a positive performance evaluation (Appx. 169). Maue had never been warned, counseled, reprimanded or disciplined for his job performance. Read admits that there are no documented deficiencies of any kind. (R Appx. 187:24—188:4)

- Failure to keep documentation. *Burton v. Freescale Semiconductor, Inc*. 798 F.3d 222 (5th Cir. 2015)

According to Amy Newman in HR, Maue was fired for insubordination (N Appx. 149:20—150:6). She alleges that Maue was given a direct job duty for the day in a specific area but would not stay in that area. (N Appx. 150:1—6). There is no documentation of this and she did not investigate it. (N Appx. 150:7—13). She did not get Maue's side of the story. (N Appx. 151:6—24). No one got Maue's side of the story. (N Appx. 151:22—24). She did nothing to advocate for Maue regarding his termination. (N Appx. 152:23—153:1). She didn't look at his job description, she didn't check to see if other supervisors left their areas, she didn't check to see how Bocanegra treated other supervisors who left their areas, she did not compare his treatment with that of other supervisors. (N Appx. 154:16—155:18).

- Shifting reasons. *Flanner v. Chae Inv. Servs. Corp*., 600 Fed. Appx. 914 (5th Cir. 2015)

Read told Maue he was fired for being unhappy. Champion told the TWC that Maue was fired because he had a "pattern of disrespect, an authoritarian management style which included yelling at and minimizing others," and "the VSM team…told management they were concerned

Maue was a poor influence on the plant" among other things. (Appx. 161). Amy Newman in HR, who was present at the termination, was asked in her deposition the reason for termination and she said "I believe insubordination" regarding leaving the roof build area. (Appx. 149-150). Champion's record of termination only lists "insubordination." (Appx. 170). The reasons listed in Read's affidavit are "personal observations of Maue's discontent, his failure to connect with the employees assigned to work for him, his behavior during the Operational Excellence visit, the input [Read] received from Felix, and Maue's insubordination in failing to supervise the roof build department despite having been directed to do so." (Read Affidavit, Def. Appx. 104, par. 12).

- Selective application of policies. *Flanner, supra*.

According to both Maue and Faulkner, managers of the build areas were freely allowed to leave their area and go to others, especially the Hispanic managers. There may, in fact, be reasons for a manager to go to other areas if, for instance, there was a problem down the production line that initiated in their area. (M Appx. 244) (F Appx. 43:5—17).

- Conflicting explanation. *Hague v. Univ. of Tex. Health Sci. Ctr.*, 560 Fed. Appx. 328 (5th Cir. 2014).

As noted above in section "i," the explanations offered by Defendant for termination conflict with the evidence, particularly regarding David Felix's testimony which conflicts substantially with both Champion's position statement to the TWC and Randy Read's testimony.

- Failure to follow disciplinary policies. *Stanton v. Jarvis Christian College*, 417 F.Supp.3d 811, 824 (E.D. Tex. 2019).

Read admits that they have progressive discipline and if conduct can be fixed, they should give an employee a chance to fix it. (R Appx. 187:10—23). There are no documented

deficiencies of Maue. (R Appx. 187:24—188:4). Champion has zero documentation of any complaint or issue with Maue. (R Appx. 188:9—189:3; 190:20—42/2; 214:21—24).

- Conduct resulting in termination was routine. Salazar v. Cargill Meat Sols. Corp., 628 Fed. Appx. 241 (5th Cir. 2015).

There is an email from the OpEx team prior to the visit stating "[i]t would be good for the kick off meeting on Tuesday morning to have all production supervisors available also." (Appx. 121—122). Read admits that Maue's job required him to interact with the OpEx team throughout the plant. These job responsibilities require the APM to travel throughout the plant. (R Appx. 219:14—221:2).

- Disparate treatment. *Brown v. Rio Petroleum, Inc.*, No. 99-11194, (5th Cir. 2001).

Daniel Ramirez was the roofing manager prior to the Defendant allegedly assigning Maue to be the roofing manager. Ramirez was fired for a long list of transgressions, including lying but he was not fired, he was transferred to the Burleson facility at the same salary. (Appx. 233; 235-36). Maue, allegedly in the role of roofing manager, was fired for allegedly leaving his area.

- Failure to investigate. *Tanner v. LSU Fireman Training Program*, No. 00-30966, 2001 U.S. App. LEXIS 31285, at *17-18 (5th Cir. 2001).

Incorporated are the facts under "failure to keep documentation," above.

- Setting up to fail. *Pegram v. Honeywell, Inc.*, 2004 WL 1844820, at *4 (N.D. Tex. 2004)

Maue testified that Bocanegra refused to provide him with the corporate job description and would not allow him to perform his APM duties and, instead, forced him to perform demeaning and belittling tasks. (M Appx. 240-43). Bocanegra communicated with the managers in Spanish and excluded Maue from the communications. (M Appx. 240). Bocanegra frequently required Maue to work on the assembly line. (M Appx. 241). A VP saw Maue and

told him that if he continued to work on the assembly line, he would lose his job as APM. *Id*. Bocanegra forced Maue to perform manual tasks under the supervision of the managers that Maue was supposed to be supervising, completely undermining Maue's authority over the supervisors. (M Appx. 241-42). The week before the OpEx team arrived, Bocanegra told Maue that he would be supervising all of production while he was in meetings. (M Appx. 244). However, then Champion used that to fire Maue, claiming he was supposed to be the roofing manager.

- Unhappiness ("Anyone who complains about unlawful discrimination is not likely to be a happy camper") *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1269 (11th Cir. 2010)

- Adding reasons not provided at termination. *Miller v. Eby Realty Group, LLC*, 396 F.3d 1105, 1112 (10th Cir. 2005).

d) "Same actor" inapplicable

i. Harm in terms and conditions from Bocanegra

The harm to Maue with respect to the terms and conditions of employment came from Bocanegra. A demotion in duties, even if not accompanied by a change in title or pay reduction, may constitute an adverse employment action. *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004). Bocanegra forcing Maue to perform belittling and demeaning tasks, including non-supervisory tasks and working on the assembly line, constitute an adverse employment action. The day that Maue was fired, Defendant alleges that Maue was performing the duties of a roof build manager and not the Assistant Production Supervisor.

ii. Cat's paw regarding termination

First, in contradiction to Read's affidavit, Maue's termination document was signed by Bocanegra and it states only that he was fired for "insubordination." (Appx. 170). It was not signed by Read. Read testified that it was he, Bocanegra and Newman that met and addressed

Maue's termination because Maue was allegedly not following the instruction to stay in the roof build. (R Appx. 192-193). The three of them "were in agreement" on termination. (R Appx. 194). Even if Read was the decision-maker (which is contradicted by his testimony), under the cat's paw theory, "a plaintiff need not show that the final, official decision-maker harbored a discriminatory animus toward [him]. Instead, the plaintiff may present evidence that a subordinate employee harbored such an animus, and that the subordinate employee's efforts led to a recommendation for termination, which the final decision-maker effectively rubber stamped." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)(collecting cases). The court in *Russell* noted that many federal courts "will not blindly accept the titular decisionmaker as the true decisionmaker." *Id.* Rather, it is "appropriate to tag the employer with an employee's [race/national origin]-based animus if the evidence indicates that the worker possessed leverage, or exerted influence, over the titular decisionmaker." *Id.*

Read admits that he did not hear Bocanegra give an alleged instruction to Maue not to leave the roofing area. (R Appx. 195). That information came from Bocanegra. *Id*. Read is not aware of when the instruction was allegedly given. (R Appx. 196:5—7). He admits that his information alleging Maue was not performing tasks assigned to him came from Bocanegra. He admits that prior to termination, he had a meeting with Bocanegra and Newsome and the three of them addressed the termination. Read testified that it was he, HR and Bocanegra that discussed their allegation that Maue was not following instructions on the day of termination. (R Appx. 192:19—193:15). He doesn't recall what Maue was doing at the time and he had not spoken to Maue that day. (R Appx. 194:4—13). Nobody suggested calling Maue in to address it with him but they all agreed to fire him. (R Appx. 194:21—195:2). Obviously, as the Production Supervisor over Maue, Bocanegra was the one providing information to Read about Maue's

conduct. Bocanegra participated in the decision to fire Maue based on information he provided to Read and Newsome.

3. Retaliation

a) Statutorily protected activity

Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue. *See, e.g., Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 348–49 (5th Cir.2007); *Broderick v. Donaldson,* 437 F.3d 1226, 1232 (D.C.Cir.2006); *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 727 (7th Cir.2003); *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1203 (10th Cir.2008). John Hinson told Amy Newman in HR that Mr. Maue "believed he was being discriminated against."(N Appx. 141:12—23). John Faulkner went to Amy Neman in HR to complain about Bocanegra "more times than [he could] count." (F Appx. 23:8—10). Faulkner "repeatedly" told Newman that there was race discrimination ongoing by Bocanegra (at least ten times F Appx. 26:15). (F Appx. 24:23—25:13). Faulkner reported to HR concerns about race discrimination by Bocanegra toward himself as well as others. (F Appx. 62:2—13). HR did not take his concerns seriously. (F Appx. 62:14—63:4). Faulkner was told that if he wanted to work at Champion, he had to "play ball" with Bocanegra. (F Appx. 62:14—63:4). When Newman said if you want to work at Champion you have to play ball with Bocanegra, Randy Read was there. (F Appx. 24:8—20). Additionally, Faulkner told Randy Read directly that the racism and favoritism by Bocanegra was "ridiculous." (F Appx. 63: 5—64:12). Read's only response was that he didn't see it that way. *Id*. Employee Kenny Briley also went to HR about the workplace race discrimination by Bocanegra. (F Appx. 29:10—18).

Maue complained to Amy Newman in HR about the race/national origin discrimination and disparaging treatment when Bocanegra would hold meetings entirely in Spanish and Bocanegra would not respond to him about what the information was. (M Appx. 242). Maue specifically told Newman his complaints about Bocanegra and that Bocanegra was discriminating due to Maue's race, specifically saying "this is racial harassment and I can't do my job when he does this." *Id*. Approximately a month and a half after Maue was hired to be APM, he told Newman about the time Bocanegra excluded him from a conversation with a department manager about solving a problem and he told her that he felt Bocanegra was discriminating against him because of his race. *Id*. After approximately Maue's third complaint that Bocanegra was intentionally discriminating, Newman told him that he is not the only one to make this complaint and she told Maue to go and tell Read about it. *Id*. Maue went to Read's office and repeated that Bocanegra was discriminating against him based on his race. (M Appx, 242-243). He responded that he did not believe it was discrimination but he would check into it. (M Appx. 243). Maue never heard anything further from him. The last time Maue complained to Newman about discrimination by Bocanegra was on February 15, 2022. *Id*. Bocanegra was introducing the department managers to the OpEx team by name and department. *Id*. When he got to Maue, he very dismissively said "this is the Assistant Production Manager" and omitted Maue's name. *Id*. While it may sound relatively innocuous, it was representative of the way Bocanegra treated Maue and how dismissive he was of Maue. He did not treat any of his Hispanic managers this way. *Id*. Maue reported it to Ms. Newman as an example of his continuing discrimination. *Id*.

Newman acknowledges that she was aware that Maue had a complaint about discrimination (N Appx. 141:12—23) and that she was aware that Maue complained about his treatment by Bocanegra. N Appx. 143:5—25).

Whether or not the conduct reported by a plaintiff actually constitutes discrimination is not the deciding factor, so long as the plaintiff has a "reasonable belief" that it is discrimination. *Long v. Eastfield College*, 88 F.3d 300, 306 (5th Cir. 1996). It is clear that Maue had a reasonable belief that he was being discriminated against on the basis of his race. Bocanegra treated him with disdain, assigned him menial tasks being supervised by the Hispanic managers he was supposed to be supervising, excluded from conversations with the Hispanic managers and treated less favorably than the Hispanic managers, all of which he reported as race discrimination.

b) Adverse Employment Action

Termination is an adverse employment action. Maue's retaliation claim is linked to his termination.

c) Causation

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in an activity protected by TCHRA; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. The plaintiff must show that the protected activity was the "but for" cause of the retaliation. "*Because [e]mployers rarely leave concrete evidence of their retaliatory purposes and motives, we may consider certain factors when determining causation: the employee's disciplinary record; whether the employer followed its typical policy and procedures when managing the employee; and the*

*temporal connection between the employee's conduct and the alleged retaliation." Tejada v. Travis Assoc. for the Blind*, 617 Fed.Appx 325, 328 (5th Cir. 2015) (emphasis added).

In *Jenkins v. Orkin Exterminating Co.*, 646 F. Supp. 1274(E.D. Tex. 1986), the court found "but for" causation based on the following evidence:

"a. [the plaintiff] had not been disciplined prior to his engaging in protected activities for any of the alleged deficiencies in his performance.

b. Although there is some evidence indicating that [the company's] disciplinary procedure may be advisory, it is significant to this court that [the company] did not follow this policy and procedure in terminating [the plaintiff], indicating that some other intent other than general business practice motivated its actions.

c. The proximity in time of the [plaintiff's] discharge and notice of corrective interview with the report to [HR] justifies the conclusion that but for the protected activity, the discharge would not have occurred.

Further, this court concludes that the discharge would not have occurred at the time that it did if [the company] had followed its own personnel policy. In other words, in the event [the company] was following its own business practices without regard to any impermissible motivation, [the plaintiff] would have had a three-day suspension prior to a termination." 646 F. Supp. At 1278.

In the instant case, all of the *Jenkins* and *Tejada* factors weigh in favor of Maue. Maue had never been disciplined, counseled or warned of any problem with his performance, attitude or any other issue. Champion did not follow its own progressive discipline policies or practices. Maue was only employed as an APM for approximately five months. During that time frame, he complained of race discrimination to HR on many occasions, complained of race discrimination

to Randy Read and a co-worker, John Hinson, informed HR that Maue had a complaint of discrimination. The first complaint of race discrimination was approximately a month and a half after he was hired as APM. The last complaint to HR of race discrimination was made on February 15, 2022—three days before he was fired. (M Appx. 243).

d) Decision Maker's Knowledge

First, Randy Read testified that it was he, Amy Newman and Bocanegra that jointly made the decision to terminate. (R Appx. 194:21—195:2). It is undisputed that Newman was aware of Maue's complaints of discrimination. (N. Appx. 141:12—23; M Appx. 242-43). Maue states that he also went directly to Read on one occasion at the instruction of Newman and told Read that Bocanegra was discriminating against him on the basis of his race and Read responded that he did not think it was discrimination. (M Appx. 243). Read denies this. However, the Fifth Circuit[1]has also held that a terminated employee does not need to produce direct evidence that the decision-maker knew of his protected activity. *Bosque v. Starr County, Tex.*, 630 Fed. Appx. 300, 305–07 (5th Cir. 2015) ("we have consistently held that direct evidence of retaliatory motive is not necessary to show causation."); Also See *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 171 (5th Cir. 2014) (imputing knowledge to an individual who had opportunity to learn about the employee's complaint during an interview about the employee); Also The Fifth Circuit "has held that the combination of temporal proximity and *possibility* of knowledge of the complaint is sufficient to satisfy a defendant's *prima facie* burden for a retaliation claim." *Bregon v. Autonation USA Corp.*, 128 Fed. Appx. 358, 361–62 (5th Cir. 2005) (emphasis added).

The Fifth Circuit found in *Bosque* that employees established a prima facie case of retaliation even when they had no direct proof that the decision-maker knew of their

complaints. *Bosque, supra,* 630 Fed. Appx. At 305. The employees instead offered circumstantial evidence that an individual who knew about their complaints communicated with the decision-maker about their terminations. *Id.* The employees could not prove the individual with knowledge of the complaints shared those complaints with the decision-maker, but it was sufficient that the individual had the *opportunity* to share the complaints with the decision-maker. *Id.*

Texas state courts also allow plaintiffs to rely on circumstantial evidence of knowledge, such as the fact that the decision-maker had an opportunity to learn about the protected activity. *City of El Paso v. Parsons*, 353 S.W.3d 215, 226 (Tex. App.—El Paso 2011, no pet.) (upholding a jury verdict in a retaliation case where a fire chief denied knowledge of the employee's complaint but the city's attorney and other fire chiefs knew the employee was the source of the complaint); *Texas Dept. of Assistive & Rehab. Services v. Abraham*, 03-05-00003-CV, 2006 WL 191940, at *7–8 (Tex. App.—Austin Jan. 27, 2006, no pet.) (upholding jury verdict where a governing board denied knowledge of the employee's complaints but the board met with two individuals who had been provided copies of the employee's complaints).

e) Pretext

Plaintiff incorporates by reference the pretext evidence provided above in section B(2)(c).

C. Assault Was Forseeable

"[A] defendant who seeks to negate foreseeability on summary judgment must prove more than that the intervening third-party criminal conduct occurred. The defendant has the burden to prove that the conduct was not foreseeable. The burden then shifts to the plaintiff to raise a fact issue by presenting controverting evidence that the criminal conduct was foreseeable." *Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999), citing *Travis v. City of*

*Mesquite,* 830 S.W.2d 94, 98 (Tex.1992); *Knoll v. Neblett,* 966 S.W.2d 622, 633–34 (Tex.App.—Houston [14th Dist.] 1998, pet. denied). "While the intervening criminal act of a third party can satisfy the requirements of a superseding cause, it does not do so where the criminal act is reasonably foreseeable." *Klages v. Gen. Ordnance Equip. Corp.*, 240 Pa. Super. 356, 374, 367 A.2d 304, 313 (1976)( third party's intervening criminal act of shooting plaintiff not a superseding cause where seller of mace pens made a product designed for use in situations involving criminal attacks).

The cases cited by Defendant are distinguishable. In *Dickerson v. Wyeth-Ayerst Lab'ys*, No. CIV. A. 92-7075, 1993 WL 319610, at *3 (E.D. Pa. Aug. 18, 1993) "plaintiff herself was unaware of the fact that she was having marital difficulties at the time that her husband shot her. If *plaintiff* was unaware of any marital difficulties, *defendants,* as plaintiff's supervisor and employer, certainly could not possibly be aware of such marital difficulties. Reasonable minds cannot differ; there is no evidence from which a jury could conclude that defendants should have foreseen any intentionally tortious or criminal conduct committed against plaintiff by her husband." *Id*. In *Morgan v. Chao*, No. CV-16-04036-PHX-DLR, 2017 WL 3215647, at *2 (D. Ariz. July 28, 2017), aff'd, 773 F. App'x 419 (9th Cir. 2019), a race and retaliation case, the plaintiff was injured in a car accident while commuting to work and claimed that but for the alleged retaliatory change in work location, he would not have been traveling to Tucson on the day of the accident. The court found no foreseeability under those circumstances.

In the instant case, when Maue was first hired at Champion, that day he informed Randy Read and Juan Bocanegra that he had a son that was suffering from schizo-affective bipolar disorder. (M Appx. 242). When Amy Newman was hired into Human Resources, Maue informed her as well about his son. *Id.* Maue explained that his son lived in the son's RV. *Id.*

He informed them of this so they would understand if he had to leave work for some associated reason. *Id.* Maue shared with Read and Newman about the changes in his son's health and that he was having to pay his son's lot rent and RV as he got worse, to insure he had someplace to live. *Id.* Over time, they both offered suggestions for his health and well-being. *Id.* Maue shared that his mother and sister were both afraid of some of his son's actions and the Maue's could not allow their son to move in with them because he was potentially dangerous. *Id.* The Defendant was on notice that Maue financially supported his son to ensure that his son would not need to live with the Maue's because he was mentally ill and dangerous. It was forseeable under those circumstances that firing Maue would affect his finances, forcing him to move his dangerous son into their home and that injury could result, which is exactly what happened.

Should the Court determine that Maue's son's conduct was not forseeable, that does not foreclose Maue's back pay claim. Read represented to Maue that he would make $80,000 to $90,000 with bonuses. (Appx. 237-38) Maue's next job after Champion was with KinoD on May 23, 2022 making $65,000. Maue is seeking back pay from Champion, including the difference between what he would have made at Champion according to Read and what I made at KinoD as well as the periods of unemployment.

IV. CONCLUSION

There are substantial issues of material fact that must be resolved by a fact finder.

WHEREFORE, Plaintiff prays that the Court deny Defendant's Motion for Summary Judgment and for such further relief as justice may require.

Respectfully submitted,

s/Susan E. Hutchison
Texas Bar No. 10354100
sehservice@FightsforRight.com

HUTCHISON & FOREMAN, PLLC
500 East 4th St., Ste. 100
Fort Worth, Texas 76102
Phone: 817-336-5533
Fax: 817-887-5471

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

This is to certify that on this Tuesday, June 25, 2024, a true and correct copy of the above and foregoing document was served on the following attorney of record via the court's electronic service:

John M. Barcus
john.barcus@ogletree.com
Molly Ann Lawrence
mollyann.lawrence@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
8117 Preston Road, Suite 500
Dallas, Texas 75225

s/Susan E. Hutchison
Susan E. Hutchison