**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MARK MAUE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:23-cv-00443-K** |
| | § | |
| **CHAMPION HOME BUILDERS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S REPLY IN SUPPORT**
**OF ITS AMENDED MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

By: */s/ John M. Barcus*

JOHN M. BARCUS
Texas State Bar No. 24036185
john.barcus@ogletree.com
MOLLY ANN LAWRENCE
Texas State Bar No. 24083365
mollyann.lawrence@ogletree.com

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
8117 Preston Road, Ste. 500
Dallas, Texas 75225
Tel: (214) 987-3800
Fax: (214) 987-3927

**ATTORNEYS FOR DEFENDANT CHAMPION HOME BUILDERS, INC.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

OVERVIEW ........ 1

ARGUMENT AND AUTHORITY ........ 2

A. Language cannot be the basis of a race or national origin discrimination claim ........ 2

B. Maue cannot establish a prima facie case of race or national origin discrimination ........ 4

C. Maue cannot demonstrate pretext with respect to his discrimination claim ........ 7

D. Maue's new "hostile work environment" claim is too late and lacks merit ........ 13

E. Maue cannot establish a prima facie case of retaliation ........ 15

F. Maue cannot demonstrate pretext with respect to his retaliation claim ........ 20

G. Maue's claim for back pay and front pay after the assault is meritless ........ 21

RELIEF REQUESTED ........ 23

CERTIFICATE OF SERVICE ........ 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agoh v. Hyatt Corp.*,
992 F. Supp. 2d 722 (S.D. Tex. 2014) ....................13

*Belmonte v. City of Dall.*,
No. 3:19-CV-2656-G-BK, 2021 WL 1903707 (N.D. Tex. Feb. 9, 2021) ....................2

*Bostock v. Clayton County, Ga.*,
590 U.S. 644 (2020)....................7, 13, 20

*Buisson v. Bd. of Supervisors of the La. Cmty. & Tech. Coll. Sys.*,
592 F. App'x 237 (5th Cir. 2014) ....................9

*Burton v. Freescale Semiconductor, Inc.*,
798 F.3d 222 (5th Cir. 2015) ....................9, 10

*Cohen v. Am. Airlines Credit Union*,
Civil Action No. 23-22876-Civ-Scola, --- F. Supp. 3d ---, 2023 WL 8018913
(S.D. Fla. Nov. 20, 2023)....................3

*Cutrera v. Bd. of Sup'rs of L. S. U.*,
429 F.3d 108 (5th Cir. 2005) ....................14

*E.E.O.C. v. Rite Way Service, Inc.*,
819 F.3d 235 (5th Cir. 2016) ....................18

*Flanner v. Chae Inv. Servs. Corp.*,
600 F. App'x 914 (5th Cir. 2015) ....................10

*Grimes v. Tex. Dep't of Mental Health and Mental Retardation*,
102 F.3d 137 (5th Cir. 1996) ....................7, 13

*Hague v. Univ. of Tex. Health Sci. Ctr.*,
560 F. App'x 328 (5th Cir. 2014) ....................10

*Jenkins v. Orkin Exterminating Co.*,
646 F. Supp. 1274 (E.D. Tex. 1986)....................18, 19

*Lauderdale v. Tex. Dep't of Crim. Justice*,
512 F.3d 157 (5th Cir. 2007) ....................3

*Morgan v. Chao*,
No. CV-16-04036-PDX-DLR, 2017 WL 3215647 (D. Ariz. July 18, 2017) ....................22

*Pegram v. Honeywell, Inc.*,
361 F.3d 272 (5th Cir .2004) ....................12

*Pegram v. Honeywell, Inc.*,
No. Civ.A.3:01-cV-0854-P, 2004 WL 1844820 (N.D. Tex. Aug. 18, 2004) ....................12

*Pena v. Dall. Police Ass'n*,
No. 3:22-CV-0987-N-BH, 2023 WL 214657 (N.D. Tex. 2023) ....................17

*Phan Son Van v. Pena*,
990 S.W.2d 751 (Tex. 1999) ....................21, 22

*Pittman v. U.S. Bank NA*,
840 F. App'x 788 (5th Cir. 2021) ....................14

*Salazar v. Cargill Meat Solutions Corp.*,
628 F. App'x 241 (5th Cir. 2015) ....................11, 12

*Stanton v. Jarvis Christian Coll.*,
417 F. Supp. 3d 811 (E.D. Tex. 2019) ....................11

*Tanner v. LSU Fireman Training Program*,
No. 00-30966, 2001 U.S. App. LEXIS 31285 (5th Cir. 2001) ....................9, 10

*Tejada v. Travis Ass'n for the Blind*,
617 F. App'x 325 (5th Cir. 2015) ....................18

*United States v. Renda Marine, Inc.*,
667 F.3d 651 (5th Cir. 2012) ....................19

*Wantou v. Wal-Mart Stores Texas, L.L.C.*,
23 F.4th 422 (5th Cir. 2022) ....................15, 20

*Watson v. Brennan*,
No. 3:20-CV-181-G-BK, 2023 WL 425831 (N.D. Tex. Jan. 9, 2023) ....................3

**DEFENDANT'S REPLY IN SUPPORT**
**OF ITS AMENDED MOTION FOR SUMMARY JUDGMENT**

Defendant Champion Home Builders, Inc. ("Champion") files its Reply in Support of its Amended Motion for Summary Judgment and states:

## OVERVIEW

In this lawsuit, Plaintiff Mark Maue ("Maue") has alleged causes of action for race and national origin discrimination, and for retaliation, in violation of the Texas Labor Code and Section 1981. Champion denies these claims. Discovery is complete. On June 4, 2024, Champion filed its Amended Motion for Summary Judgment and Brief in Support ("Motion") (doc. 29). Maue filed his Response to Defendant's Amended Motion for Summary Judgment ("Response") (doc. 32) on June 25, 2024.

In the Response, Maue relies primarily on his own sham affidavit in an attempt to muddy the waters. This and other aspects of Maue's evidence are inadmissible. Contemporaneously herewith, Champion has filed its Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence ("Motion to Strike") (doc. 33). Champion incorporates the Motion to Strike herein by reference for all purposes.

## ARGUMENT AND AUTHORITY

In the Motion, Champion demonstrated that it is entitled to judgment on Maue's discrimination and retaliation claims as a matter of law. For the reasons set forth below, Maue has failed to present evidence sufficient to create a genuine issue of material fact with respect to any of these grounds. The Court should grant the Motion in all respects.

### A. Language cannot be the basis of a race or national origin discrimination claim.

Maue's race and national origin discrimination claims arise out of the use of Spanish in the workplace. Specifically, Maue contends that Juan Carlos Bocanegra (his boss) and others spoke in Spanish, which they knew Maue did not understand, in an attempt to exclude him or frustrate his ability to do his job. As a matter of law, language "cannot be the basis of a race or national origin claim." *Belmonte v. City of Dall.*, No. 3:19-CV-2656-G-BK, 2021 WL 1903707, at *2 (N.D. Tex. Feb. 9, 2021). Thus, to the extent Maue's claims are based on the use of (or the *effect* of the use of) Spanish in the workplace, they fail out of the gate. [Motion pp. 24-26.]

Maue's response is to say that his discrimination claims do not *really* arise out of the use of Spanish in the workplace. Specifically, "Maue is not claiming discrimination based on the use of language." [Response p. 23.] He now characterizes his claim as premised on "the use of language to intentionally exclude him from necessary communications, especially by Bocanegra, [which] is evidence of Bocanegra's attitude toward him versus the Hispanic employees at the facility." [*Id.*] That's just the same concept expressed differently. The use of language is still the purported discriminatory conduct, and excluding Maue from "necessary communications" is the deleterious effect. By attempting to thread this needle, Maue effectively concedes that if his claims *do* arise out of "the use of language," they fail for the reasons explained in the Motion and the several cases cited therein, none of which Maue challenges or rebuts.

As a matter of law, Champion did not discriminate against Maue on the basis of his race or national origin just because Maue's supervisor spoke Spanish in his presence – even if it was with the intent to exclude him from the conversation. On this point, Maue's silence with respect to the *Cohen* case is particularly telling. The court in *Cohen* examined factual allegations strikingly similar to those made by Maue, namely, that the White plaintiff's Hispanic supervisor "expressed frustration at the Plaintiff's inability to speak Spanish and would frequently speak Spanish, with other employees, in front of Plaintiff despite the Plaintiff repeatedly asking [the supervisor] to stop this unjustified criticism." *Cohen v. Am. Airlines Credit Union*, Civil Action No. 23-22876-Civ-Scola, --- F. Supp. 3d ---, 2023 WL 8018913, at *4 (S.D. Fla. Nov. 20, 2023) (slip copy). The court held that even if the Hispanic supervisor's "alleged efforts to exclude the Plaintiff from conversations conducted in Spanish rise to the level of adverse employment action, which they likely do not, the ability or inability to speak Spanish is not equivalent to national origin." *Id.* at *3.

Perhaps the supervisor's behavior in the *Cohen* case was uncivil, and perhaps Bocanegra's was as well, at least from Maue's perspective. Courts have long recognized that "federal anti-discrimination statutes do not create a 'general civility code' in the workplace." *Watson v. Brennan*, No. 3:20-CV-181-G-BK, 2023 WL 425831, at *2 (N.D. Tex. Jan. 9, 2023) (quoting *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007)).[1] The fact that "Bocanegra would be speaking to an Hispanic manager in English but when he saw Maue approaching, they would switch to Spanish to exclude Maue from the conversation"[2] simply is not actionable.[3] The Court should grant the Motion for this reason alone.

---

[1] Maue recognizes *Lauderdale* as controlling precedent. [Response p. 18.]

[2] How Maue knew what language was being spoken before "approaching" is unclear, and this speculative testimony is part of the Motion to Strike.

[3] Consider this: if two White, non-Hispanic employees who both happened to know Spanish consistently spoke to each other in that language, to Maue's frustration and despite his requests that they do otherwise, that would not be

**B. Maue cannot establish a *prima facie* case of race or national origin discrimination.**

Maue mischaracterizes the fourth element of the *prima facie* case of discrimination based on circumstantial evidence.[4] "The issue, then, is whether [Maue] was 'otherwise' discriminated against because of his race/national origin – disparate treatment." [Response p. 23.] Setting aside for now his "hostile work environment" claim, the only "adverse action" Maue relies on in the Response is his claim for wrongful termination. The only issue remaining to be decided is whether Maue was otherwise ***discharged*** because of his race.

Champion argued in the Motion that the only actionable adverse employment action presented by the evidence is its termination of Maue's employment. [Motion pp. 26-27.] Maue cites case law in the Response for the proposition that "even if a plaintiff is not terminated, a demotion in duties, even if not accompanied by a change in title or pay reduction, may constitute an adverse employment action." [Response p. 22 (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir .2004)).] Perhaps so, but a page later, Maue says "there is no dispute that Mr. Maue was discharged," thus presenting discharge as the adverse employment action he intends to take to trial. This is further confirmed when the only comparator he cites is Daniel Ramirez, who in Maue's view was similarly situated but did not suffer the same adverse action (termination). [Response pp. 23-24 – solely discussing Maue's discharge, not work responsibilities] He then

actionable under the TCHRA or Section 1981. The fact that the people choosing to speak Spanish in his presence happened to be Hispanic does not change the legal analysis.

[4] As discussed in the Motion, a plaintiff alleging discrimination may proceed using either direct or circumstantial evidence. Maue agrees, and does not rebut Champion's contention that he lacks direct evidence. [Response p. 18.] Maue therefore must rely on the *McDonnell Douglas* framework, under which he must first make out a *prima facie* case. The elements are not in dispute. Maue must produce evidence that (1) he was discharged; (2) he was qualified for the position; (3) he was within a protected class; and (4) he was replaced by someone outside the protected class or "otherwise discharged because of his race." [Response pp. 21-22 (citing *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993))]. The first three elements are undisputed.

proceeds to discuss all the ways in which Champion's articulated reasons for a single adverse action – termination – are mere pretexts for discrimination. [*Id.* pp. 24-32.]

Maue does not have admissible evidence sufficient to raise a fact question on this point. He relies exclusively on a "disparate treatment" theory, *i.e.*, the notion that a similarly situated person outside of his protected class was treated more favorably under similar circumstances. "Disparate treatment can be shown by comparing one person's experience to that of a person without the protected trait. But it can also be shown if, but for that person's protected trait, the outcome would have been different." [Response p. 22 (citing *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006 (5th Cir. 2023)).]

Maue's ***only*** evidence of "disparate treatment" in support of his wrongful termination claim relates to Ramirez. [Motion pp. 23-24.] Maue and Ramirez were not "similarly situated," whether in their roles at Champion or with respect to the behavior in which they engaged. Maue was the Assistant Production Manager – the "number two in the plant." [Motion p. 28 (citing evidence).] Ramirez had been the floor build department manager, but Read removed him from that position – and from the Mansfield facility – shortly before the Operational Excellence site visit[5], and Bocanegra tasked Maue with filling in for Ramirez and supervising the roof build department during that visit. Maue disobeyed those orders, but that was not the only reason for his termination.

Read testified in detail regarding the expectations he had when he created the APM position specifically *for* Maue and brought Maue back to Champion to fill it, and about his dissatisfaction with Maue's performance in that role. At least in Read's view (and it is his view that matters), Maue was a low performer even before the Operational Excellence team visited the Mansfield facility. [App. 103 (Read Declaration ¶ 8).] By his own admission, Maue griped to Operational

[5] Motion pp. 12-15.

Excellence team member Dave Felix about Bocanegra's work as his manager, and his "discontent" about being able to perform his job duties. [Motion p. 14 (citing Maue's testimony).] Felix told Read about this, including words to the effect of "Maue would not be on my team and shouldn't be on yours." [*Id.* (citing evidence).] Based on all of this, and on his perception (right or wrong) that Maue was not happy working at Champion, Read decided to terminate Maue's employment.[6]

Read testified that Ramirez had leadership issues as a department manager and engaged in insubordination of a different type than Maue. As a result, Read ended Ramirez's employment at the Mansfield facility. Maue makes much of the fact that after deciding Ramirez was no longer welcome in Mansfield, Read reached out to the manager of Champion's facility in Burleson, Texas, because Read knew that his counterpart "would be interested in – in Daniel. So I called him and told him what happened. And then I left that up to him." [Pl. App. 208-209 (Read 72:25 – 73:10).]

Read didn't "recommend" that Ramirez be hired in Burleson. To the contrary, he told the Burleson manager that Ramirez had been terminated from Mansfield (*and the non-favorable reasons why*), and let him know that Ramirez "would be available, because that happens a lot between Mansfield and Burleson because the – the plants are so close together." [Pl. App. 210 (Read 74:4-13).] The fact that Read did not reach out to the Burleson manager to let him know that Maue was being let go as the Assistant Production Manager for poor performance, insubordination, and general unhappiness does not prove anything. Even under his "disparate treatment" theory, Maue cannot create a fact question on the final element of his *prima facie* case.

---

[6] Maue faults Champion for how it handled the termination, including the involvement (or alleged lack of involvement) of Amy Newman from Human Resources. [Motion pp. 15-16.] Whether or not Champion followed its own procedures or general best practices in carrying out the termination is not relevant, and the argument is a red herring.

**C. Maue cannot demonstrate pretext with respect to his discrimination claim.**

Maue does not dispute that Champion has carried its burden under *McDonnell Douglas* to articulate a legitimate, non-discriminatory reason for its actions. Accordingly, to survive summary judgment, Maue must create a fact question regarding whether Champion's articulated reasons for terminating his employment are false or pretextual. *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 141 (5th Cir. 1996).

With respect to Maue's TCHRA claims, "pretext" evidence is sufficient if it "(1) creates a fact issue as to whether the employer's stated reason was what actually motivated the employer ***and*** (2) creates a reasonable inference that the protected category (age or gender)[7] was a motivating factor in the actions of which plaintiff complaints." [Response at p. 24 (citing authority).] Maue fails to recognize that a significantly higher "but-for" standard applies to his Section 1981 claims. *Bostock v. Clayton County, Ga.*, 590 U.S. 644, 656 (2020). Maue's evidence, such as it is, is insufficient to create a fact question under either test.

He does not rely on much. He attacks Champion's articulated reasons, the first of which is that Champion perceived Maue as not connecting with employees assigned to work for him. According to Maue, this is "nonspecific and a nonreason. There is really no way to know what it even means." [Response p. 25.] Of course, one way to "know what it even means" would have been to ask Read that question in his deposition. Counsel did not, and did not depose Bocanegra at all. Maue then directs the Court to his own self-serving affidavit testimony about how Bocanegra assigned him to do "menial and non-supervisory tasks form the very beginning, preventing him from engaging as a supervisor." [Response p. 25.] Maue offers no competent evidence as to *why* Bocanegra assigned him what he perceived as "menial" tasks, or otherwise explain why this one

[7] Presumably, Maue meant to refer here to race or national origin.

of Champion's several articulated reasons for its action is unworthy of credence. Maue's ***speculation*** that he was instructed to perform certain tasks because of his race or national origin is not ***evidence***, and the Court should not consider it.

Maue argues that Champion's next articulated reason for firing Maue – his behavior during the Operational Excellence site visit – is "unsupported." [Response p. 26.] It is not. Read testified in detail about Maue's assignment to supervise the roof build department on the day of the visit. [Motion p. 13.] Maue does not dispute that he did *not* remain in the roof build department, and instead spent time following the Operational Excellence team around the facility, complaining all the while. Maue may not agree that this behavior was a sound basis for the employment decision at issue, but he has no evidence suggesting that it was not, *in fact*, one of Champion's reasons for ending Maue's employment.

The same is true with respect to Read's perception, based on his own observation and on Felix's statements to him, that Maue was "unhappy." This is not a "nonspecific, nonreason." [Response p. 26.] Maue's only evidence to the contrary is his self-serving testimony that he "loved the position of Assistant Production Manager and I enjoyed performing tasks associated with that position." [Pl. App. 243.] If that is indeed true, it was hard to tell. Felix (of the Operational Excellence team) certainly perceived Maue as unhappy. When Maue told Felix that Read had terminated his employment, and expressed the perception that Maue was unhappy, Felix replied and said, "based on what I heard from you during my site visit, I would have to agree with Randy. During my visit, not one time did I hear you 'brag' about who you work for or about what we do as a company. My impression? It seemed you felt defeated and wanted confirmation, based from what I heard, that this feeling you had was valid. I'm sorry, but I am unable to do so." [Motion p. 16 (citing evidence).] Maue has no evidence to contradict Champion's evidence that Read – based

on his own observations and input from Felix – perceived Maue as unhappy, or to suggest that this articulated reason was a pretext for discriminatory termination.

After these unsuccessful attempts to discredit Champion's evidence, Maue turns to a bullet point list of things courts have found to be "evidence of pretext." [Response pp. 29-32.] In some instances, he misconstrues the law. In others, the facts alleged do not align with the principles articulated in the cases. Maue first argues that "evidence of satisfactory performance" is evidence of pretext, citing *Buisson v. Bd. of Supervisors of the La. Cmty. & Tech. Coll. Sys.*, 592 F. App'x 237 (5th Cir. 2014). That is a gross oversimplification. The court in *Buisson* noted that "just prior to his decision to terminate" the plaintiff's employment, the decisionmaker "promoted" the plaintiff, which it considered evidence from which the "jury could infer" that the decisionmaker did not believe the plaintiff performed poorly. *Id.* at 244. Read was impressed with Maue's *background* and was satisfied with his performance during his first stint at Champion, and for that reason brought Maue back on as the APM after creating the position with Maue in mind. It is undisputed that Read was not happy with Maue's performance *as* the APM, which is what matters. There is no evidence of "satisfactory performance."

Maue next contends that "failure to keep documentation" and "failure to investigate" can be evidence of pretext, citing *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015) (failure to keep documentation) and *Tanner v. LSU Fireman Training Program*, No. 00-30966, 2001 U.S. App. LEXIS 31285, at *17-18 (5th Cir. 2001) (failure to investigate). The court's holding in *Burton* was more nuanced. "A lack of contemporaneous documentation, alone, is not evidence of pretext; the employee must also demonstrate why the absence of documentation matters. Otherwise, there would be no basis upon which a jury could infer pretext." *Id.* at 240. In *Burton*, it mattered because the defendant-employers "attempted to buttress the charge [of a long history of poor performance] by compiling documentation after the fact." *Id.* Maue's complaint,

by contrast, is that there is no documentation of the fact that Maue "was given a direct job duty for the day in a specific area but would not stay in the area," which he believes Amy Newman (HR) should have looked into in the course of "advocat[ing] for Maue regarding his termination." [Response p. 29.] *Burton* and *Tanner* do nothing for Maue.

Maue argues further that "shifting reasons" and "conflicting explanations" can be evidence of pretext, relying on *Flanner v. Chae Inv. Servs. Corp.*, 600 F. App'x 914 (5th Cir. 2015) (shifting reasons) and *Hague v. Univ. of Tex. Health Sci. Ctr.*, 560 F. App'x 328 (5th Cir. 2014). Perhaps so, but Maue fails to explain how Champion's reasons have "shifted" or how its "explanations" conflict. Read testified that his decision was based on his observations of Maue's discontent, his failure to connect with the employees assigned to him, his behavior during the Operational Excellence visit, Felix's input *regarding* that behavior, and his insubordination in failing to supervise the roof build department during the time of the Operational Excellence visit. [App. 104 (Read Decl. ¶ 12).] Newman did not make the decision. Her understanding is that Maue's insubordination during the Operational Excellence visit was the reason, and Champion's termination paperwork reflects the same. Champion told the Texas Workforce Commission about *all* of this. [Pl. App. 159-163.] Maue says in support of his "shifting reasons" argument that "Read told Maue he was fired for being unhappy," but cites no evidence and tellingly does ***not*** say that Read did not mention any or all of the other reasons to Maue. There are no inconsistencies in Champion's uncontroverted explanations for its personnel action.

Maue relies on *Flanner* in support of an argument that "selective application of policies" can be evidence of pretext. [Response p. 30.] It is not clear what "policies" Champion is said to have selectively applied. Maue relies on his own testimony, and testimony from John Faulkner, that "managers of the build areas" were "freely allowed to leave their area and go to others" and that there "may . . .be reasons for a manager to go to other areas[.]" [Response p. 30 (discussing

evidence).] Maue does not explain the significance of this testimony or explain why he, as the Assistant Production Manager, needed to be outside picking up nails (whether during the time he was supposed to be supervising the roof build department or otherwise). Indeed, Maue admits that "[t]hese were not on the list of reasons for terminating." [Response pp. 28-29.]

Maue next contends that "failure to follow disciplinary policies" can be evidence of pretext, citing *Stanton v. Jarvis Christian Coll.*, 417 F. Supp. 3d 811, 824 (E.D. Tex. 2019). The portion of *Stanton* on which Maue relies has to do with FMLA retaliation, rather than race discrimination, and the discussion is limited to the fact that the employer "never contacted" the plaintiff for an explanation regarding property she allegedly stole, which the plaintiff "contend[ed] goes against Defendant's disciplinary policy." *Id.* at 825-826. Moreover, what "disciplinary policies" did Champion fail to follow? This is not clear. Read testified that Champion has "progressive discipline," but made clear that whether Champion should "give [the employee] a chance to fix" the issue(s) is dependent on circumstance: "there are some things that you don't have to give them a chance to fix, and there are some things you do need to give them a chance to fix." [Pl. App. 186-187.] Maue presents no evidence that his insubordinate behavior(s), coupled with the other observed deficiencies in his performance, were the type of thing that Champion should have given him a "chance to fix." Maue also has not put Champion's progressive discipline policy in evidence.

Continuing down the list, Maue argues that if the "conduct resulting in termination was routine," pretext may be inferred, citing *Salazar v. Cargill Meat Solutions Corp.*, 628 F. App'x 241 (5th Cir. 2015). The facts of *Salazar* matter. In that case, a twenty-year employee "was taking a drink of coffee" when his new manager asked him a question and "was not able to answer out loud, so he shrugged his shoulders as a way of indicating no to the question." *Id.* at 243. He was fired "on the spot." *Id.* The employee believed it was "permissible to answer" the question in the way he did, and he and others had "often responded to questions nonverbally" without

repercussion. *Id.* Coupled with evidence that "the day of his firing, two new, younger employees" began working for the employer, one of whom "assumed his job duties," the Fifth Circuit concluded that the plaintiff had carried his burden on pretext. Maue, much unlike Salazar, was not fired for shrugging his shoulders or anything like it. He was fired for conduct that Read, at least, considered anything but "routine." There is no evidence that a new employee began working for Champion the day of Maue's termination and assumed his job duties. Indeed, Maue presents no evidence that he was replaced at all.

Finally – other than repeating his disparate treatment arguments in the context of pretext – Maue argues that "setting [him] up to fail" is evidence of pretext, and offers *Pegram v. Honeywell, Inc.*, No. Civ.A.3:01-cV-0854-P, 2004 WL 1844820, at *4 (N.D. Tex. Aug. 18, 2004) in support. In *Pegram*, the plaintiff was first demoted into a position he did not want, expressed concern that he would not be able to make his sales quota, only to see his employer take accounts away from him while refusing to reduce his quota, "thereby setting Plaintiff up to fail in this position." *Id.* Maue claims that Bocanegra set him up to fail by asking him to perform "demeaning and belittling tasks," including working on the assembly line, allegedly "under the supervision of the managers Maue was supposed to be supervising." [Response pp. 31-32 (citing evidence).] However, Maue admitted that his job description says that "***when the production manager is on site, the assistant follows and supports the manager's direction***." [Motion at p. 10 (citing evidence).] He also never refused any of Bocanegra's directives, and did not even bother to ask Bocanegra why he was asked to perform those tasks. *Id.* The evidence does not suggest that Champion set Maue up to fail. To the contrary, Read's testimony establishes that Champion wanted and expected Maue to succeed and provided him the opportunity to do so.

In summary, none of Maue's arguments in favor of pretext are persuasive, and the case law on which he relies is generally off point, whether factually, legally, or both. Maue's attacks on

Champion's evidence of its nondiscriminatory reasons for terminating his employment are also unavailing. Importantly, it is incumbent on the Court not to lose sight of Maue's dual burden. "Simply disputing the underlying facts" of Champion's decision is not enough. *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 736-737 (S.D. Tex. 2014). Rather, Maue not only must create a fact question regarding whether Champion's stated reasons for its actions are true, but also must produce evidence that "creates a reasonable inference" that he would not have been fired ***but for*** the fact that he is White and non-Hispanic (Section 1981) or that his race and national origin was a "***determinative factor***" in Champion's decision (TCHRA). *Bostock*, 590 U.S. at 656 (Section 1981); *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 141 (5th Cir. 1996) (TCHRA). Maue has failed to carry his burden. The evidence he offers does not create a reasonable inference that he was fired because he is White and non-Hispanic. The Court should grant the Motion with respect to Maue's race and national origin discrimination claims under both statutes.

**D. <u>Maue's new "hostile work environment" claim is too late and lacks merit.</u>**

In the Response, prior to discussing his wrongful termination claim, Maue argues that "a plaintiff may establish a TCHRA violation based on race/national origin discrimination creating a hostile work environment. The only issue is whether Arthur's [*sic*] behavior created a hostile or abusive working environment." [Response p. 18.] He then identifies the elements he is required to prove: "where the claim of harassment is against a supervisor, there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a 'term, condition, or privilege' of employment." [Response p. 18 (citing authority).] With respect to the final element, Maue must plead and prove that the

harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [*Id.* pp. 18-19 (citing authority).]

Maue did not ***plead*** a hostile work environment claim. Rather, he alleges in the Complaint that Champion terminated his employment, and that it did so "because of his national origin, race, and/or protected activity." [Doc. 1 ¶ 27.] He discusses the use of Spanish in the Complaint, but does not allege the elements of a hostile work environment claim. Indeed, the *only* cause of action asserted is "DISCRIMINATION/RETALIATION IN VIOLATION OF TEXAS LABOR CODE AND SECTION 1981." [Doc. 1 § 4.] In that section, he alleges the elements of a standard discrimination claim (he is a member of a protected class, he was qualified for his role, he was "subject to adverse employment action, up to and including his termination," and Champion's actions constitute unlawful discrimination and retaliation). [*Id.* ¶¶ 32-36.] Maue did not ***plead*** that he was subject to unwelcome harassment, or that any such harassment was based upon his race or national origin, or that the harassment was so severe and pervasive as to affect a term, condition, or privilege of employment. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of L. S. U.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). *See, e.g.*, *Pittman v. U.S. Bank NA*, 840 F. App'x 788, 789-790 (5th Cir. 2021) ("Our precedent precludes a plaintiff from advancing a new claim or reframing a previously presented one in response to a motion for summary judgment.").

If the Court is inclined to consider the hostile work environment claim, it should find that Maue fails to raise a fact question regarding several essential elements. First, the things about which he complains are not "harassment." Even if Bocanegra conducted meetings in Spanish, or "switched to Spanish" when he saw Maue approaching, or converted conversations to Spanish after joining them, those are not instances of "harassment" based on Maue's protected

characteristics (*i.e.*, being White and non-Hispanic). As discussed above, being unable to speak Spanish is *not* a protected characteristic, as language is not inherently tied to race or national origin.

Likewise, even if Bocanegra assigned Maue "menial" tasks, Maue has no evidence that Bocanegra did so because Maue is White and non-Hispanic, much less that Bocanegra's assignment of these tasks constituted purposeful "harassment." As noted above, Maue's job description called on him to follow Bocanegra's instructions. The fact that Maue chafed at some of these instructions does not convert them into actionable harassment. Maue likewise has not alleged facts that, if true, would demonstrate a level of harassment so "severe and pervasive" as to affect a term or condition of employment. At most, Maue has alleged the sort of general incivility that as a matter of law does ***not*** rise to the level of actionable race-based harassment. The Court should dismiss the untimely and unpleaded hostile work environment claim on its merits.

**E. Maue cannot establish a *prima facie* case of retaliation.**

To establish a *prima facie* case of retaliation in the absence of direct evidence, Maue must produce evidence raising a fact question on three elements: (1) he participated in "protected activity" under either the TCHRA or Section 1981; (2) Champion took adverse action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 436-437 (5th Cir. 2022).[8]

Champion demonstrated in the Motion that Maue lacks evidence that he engaged in "protected activity," principally because his complaints to Human Resources were about the use of the Spanish language in the workplace. As discussed above, the ability or inability to speak the Spanish language is not inherently tied to either race or national origin. Therefore, to the extent Maue's retaliation claim is premised on the notion that he complained about Spanish being spoken

[8] Champion incorrectly cited *Wantou* as 22 ***F.3d*** 422 in the Motion, and regrets any confusion it may have caused.

in the workplace (whether for the purpose of excluding him from conversations or otherwise), his complaints were not about actionable discrimination, and therefore did not constitute "protected activity."

Even if Maue claims his complaints were about something other than the use of Spanish, his Response is puzzling. He first concedes that although "magic words are not required . . . protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." [Response p. 34 (citing authority).] He then proceeds to inform the Court that other employees – John Hinson, Kenny Briley, and John Faulkner – allegedly complained to Human Resources and/or to Read directly that Bocanegra was engaging in unspecified discriminatory behavior. *Id.* Of course, these employees' alleged complaints do not constitute protected activity ***by Maue***, so the relevance is unclear.

Maue then turns to what he says *he* told Human Resources. He relies only on his self-serving affidavit, rather than his deposition testimony. Notably, the two are not in harmony. During his deposition, Maue testified he complained to Newman about Bocanegra communicating in Spanish and refusing to tell him "what the information was" that he communicated in meetings. He also recalled complaining "to the front office" that he was "being discriminated against because I was being left out of conversations intentionally," and that he "should not be doing [laborer] level work." [Motion pp. 32-33 (citing evidence).] In his summary judgment affidavit, Maue now claims that he specifically said to Newman that "this is racial harassment and I can't do my job when he does this," and that at Newman's suggestion, he told Read that Bocanegra "was discriminating against me based on my race."[9]

[9] In his deposition, Maue denied having brought the "menial labor" issue to Read at all. [App. 26-27 (Read 58:15 – 59:23).]

Even if the Court credits Maue's after-the-deposition recollection of having used the words "racial harassment," that sort of conclusory statement – in effect, the use of "magic words" – does not convert Maue's complaint into protected activity.[10] *See, e.g.*, *Pena v. Dall. Police Ass'n*, No. 3:22-CV-0987-N-BH, 2023 WL 214657, at *6 (N.D. Tex. 2023) (finding that although plaintiff alleged several complaints about "harassment and discrimination," general allegations are not enough) (citing *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006)). If the Court chooses to consider Maue's affidavit testimony about how he complained to Newman that Bocanegra introduced him "dismissively" by referring to his title rather than his name, that is not protected activity because it not a complaint about discrimination. It is a complaint, at most, about incivility.

Maue argues that "whether or not the conduct reported by a plaintiff actually constitutes discrimination is not the deciding factor, so long as the plaintiff has a 'reasonable belief' that it is discrimination." [Response p. 36 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 306 (5th Cir. 1996)).] He says it is "clear" that he had a "reasonable belief" that he was being discriminated against on the basis of his race, based on the fact that "Bocanegra treated him with disdain, assigned him menial tasks being supervised by the Hispanic managers he was supposed to be supervising, Excluded [him] from conversations with the Hispanic managers and treated [him] less favorably than the Hispanic managers[.]" [Response p. 36.]

Maue has not presented the Court with evidence from which it may conclude that a fact question exists regarding whether Maue "reasonably believed" that the practices he opposed were actually "unlawful employment practice[s]" under the TCHRA or Section 1981. At most, Maue has created a fact question regarding whether he reasonably believed Bocanegra treated him

[10] The Court should not rely on this sham testimony, for the reasons stated in Champion's Motion to Strike.

*unkindly or unfairly*, or perhaps without showing the respect Maue believed he deserved, but this is not enough evidence to allow the Court to conclude that Maue therefore "reasonably believed" that he was "providing information about a Title VII violation." *E.E.O.C. v. Rite Way Service, Inc.*, 819 F.3d 235, 242-243 (5th Cir. 2016).

The third element of Maue's *prima facie* case requires him to produce evidence "that the protected activity was the 'but for' cause of the retaliation." [Response p. 36.] He has not done so. In arguing that he created a fact question under this test, Maue relies on *Tejada v. Travis Ass'n for the Blind*, 617 F. App'x 325, 328 (5th Cir. 2015) and *Jenkins v. Orkin Exterminating Co.*, 646 F. Supp. 1274 (E.D. Tex. 1986). These cases, according to Maue, allow a court to consider whether (1) the plaintiff had been disciplined for any of the "alleged deficiencies in his performance" prior to complaining; (2) the employer followed its general disciplinary policies; and (3) there is close temporal proximity between the protected activity and the adverse action. These factors do not help Maue. As discussed above, Maue's rank insubordination during the Operational Excellence site visit, including his refusal to obey clear instructions to remain in the roof build department and his litany of complaints expressed to Felix, occurred *immediately* prior to Maue's termination. He had not previously been "disciplined" for similar deficiencies, because they had not previously happened. Read also took Maue's perceived unhappiness at Champion into account, but that is not something related to "discipline" in any manner.

Maue's contention that "Champion did not follow its own progressive discipline policies or practices" is completely unsupported by the evidence. First, Maue has not put Champion's progressive discipline policies into evidence, and there is no basis from which the Court may conclude that Champion failed to follow those policies. Read testified that Champion *generally* practices progressive discipline, but that in some cases, an employee's behavior is such that giving them the opportunity to correct their deficiencies is not warranted. That is what occurred here.

Thus, the evidence actually supports the conclusion that Champion *did* follow its established procedures. It happens to have been a harsh result for Maue, and one that he may believe was unfair, but according to Read, not everyone gets a second chance, and he concluded (consistent with the procedure he described) that Maue was undeserving of one.

With respect to temporal proximity, Maue says that he was "only employed as an APM for approximately five months," and during that time "complained of race discrimination . . . on many occasions." [Response pp. 37-38.][11] According to Maue, "the first complaint of race discrimination was approximately a month and a half after he was hired as APM." *Id.* The fact that Champion did not terminate his employment for three and a half more months tends to disprove causation. If Champion really had it out for Maue for his complaints about Bocanegra and others speaking Spanish in the workplace, presumably it did not need to wait until the Operational Excellence site visit to act on its desire to rid itself of Maue. Even if Read knew about all of Maue's complaints to Human Resources at the time he made the decision to terminate Maue's employment,[12] Maue does not have evidence from which the Court may properly conclude that a causal link exists between those complaints and the ultimate adverse action of termination. He has only the sort of "unsubstantiated assertions, improbable inferences and unsupported speculation" that are *never* sufficient to defeat summary judgment. *United States v. Renda Marine, Inc.*, 667 F.3d 651, 655 (5th Cir. 2012). Maue has not created a fact question regarding his *prima facie* case of retaliation.

[11] He also says that his co-worker John Hinson "informed HR that Maue had a complaint of discrimination," which is not protected activity on Maue's part.

[12] Maue spends considerable time in the Response making the case that even if Read did not know about all of his "protected activities," Champion's knowledge is "imputed" to Read. This is not a case-dispositive issue. Champion is entitled to summary judgment on the retaliation claim even if Read is deemed to have known about all of Maue's alleged protected activity, and the Court need not get bogged down.

**F. <u>Maue cannot demonstrate pretext with respect to his retaliation claim.</u>**

Maue does not dispute that Champion carried its minimal burden to articulate a legitimate, non-retaliatory reason for its decision to terminate his employment. Accordingly, under the burden-shifting framework, Maue must produce evidence sufficient to create a fact question regarding whether his protected activities were the "but for" cause of Champion's decision. As discussed in greater detail in the Motion, "but for" causation is a significantly higher bar than demonstrating a "causal connection" at the *prima facie* stage. Maue must come forward with evidence that, if believed, would prove that Champion's action "would not have occurred but for the protected conduct." *Wantou*, 23 F.3d at 436-437. Even if Maue's protected conduct was a "substantial element" in Champion's decision – which it was not – "no liability for unlawful retaliation arises if the employee would have faced that discipline even without the protected conduct." *Id.*

Maue makes no effort to distinguish the *Wantou* case in the Response. He cites no case law at all. Instead, he falls back on – and "incorporates by reference" – the purported evidence of pretext discussed above in the context of the discrimination claim. [Response p. 39.] Champion therefore incorporates by reference its arguments set forth above. The evidence does not create a fact question regarding whether Champion's explanations are a pretext for retaliation any more than it creates a fact question regarding whether they are a pretext for discrimination. Moreover, ***Read's testimony regarding the factors that went into the termination decision is unrebutted.*** Maue does not like the fact that Read disapproved of his complaints to Felix, or his refusal to obey orders to supervise the roof build department, or his evident unhappiness, but Maue has no evidence that Read did *not* take them into account, and certainly has no evidence that Read would have made a different decision if all of those facts remain the same, but Maue's "protected activity" never occurred. *Wantou*, 23 F.3d at 436-437. *See Bostock*, 590 U.S. at 656 ("a but-for test directs

us to change on thing at a time and see if the outcome changes. If it does, we have found a but-for cause"). For this reason as well as the others discussed above, Maue's retaliation claim, whether stated under the TCHRA or Section 1981, fails as a matter of law. The Court should grant this aspect of the Motion.

**G. <u>Maue's claim for back pay and front pay after the assault is meritless.</u>**

Champion's final argument in the Motion relates to damages. Specifically, Champion contends that even if the Court finds a fact question with respect to liability, it should grant partial summary judgment with respect to Maue's claim for what amounts to lifetime back pay and front pay damages, on the theory that the post-employment criminal assault perpetrated on Maue by his adult son was somehow a foreseeable result of (and proximately caused by) Champion's decision to separate Maue from employment. [Motion pp. 36-41.]

Maue's arguments in the Response are feeble and unpersuasive. The only Texas case he cites is *Phan Son Van v. Pena*, 990 S.W.2d 751 (Tex. 1999), which stands for the proposition that where a defendant seeks summary judgment on the "foreseeability" element of a negligence claim, and relies on intervening third-party criminal conduct to break the causal chain, it must "prove that the conduct was not foreseeable." *Id.* at 754. That's true, and the Texas Supreme Court held that the defendant *did* carry its burden, reversed the court of appeals, and rendered judgment in favor of the defendant. Of course, this is an employment discrimination case, not one involving negligence, and the foreseeability issue here relates to damages, not liability.

In support of his contention that suffering a debilitating criminal assault was a foreseeable result of being fired, Maue submitted declaration testimony in which he claims to have told Read, Newman, and Bocanegra at the outset of his employment that "I had a son that was suffering from schizo-affective bipolar disorder." [Pl. App. p. 245.] He mentioned this "so they would understand if I had to leave work for some associated reason," and at some unspecified time, "shared that his

mother and sister were both afraid of some of his actions and we could not allow him to move in with us because he was potentially dangerous." *Id.*

From that testimony alone, Maue asks the Court to find a fact question regarding whether it was "foreseeable under those circumstances that firing Maue would affect his finances, forcing him to move his dangerous son into their home and that injury could result, which is exactly what happened." [Response at p. 41.] "Foreseeability" is not the test. *Reasonable* foreseeability is the test. That is the entire lesson of *Palsgraf* – anything is "foreseeable" if you squint hard enough. In the *Morgan* case cited in the Motion, "even if . . . a person driving more miles has a greater chance of being involved in an accident," and even if "auto accidents are commonplace and the chance of having one is greater the more one drives, the accident in this case was not a ***reasonably foreseeable*** consequence of Defendant's alleged misconduct – that is, discrimination and retaliation in violation of Title VII." *Morgan v. Chao*, No. CV-16-04036-PDX-DLR, 2017 WL 3215647, at *2 (D. Ariz. July 18, 2017).

"Whether a defendant's misconduct is a proximate cause of the plaintiff's injury entails a judgment, at least in part policy based, as to how far down the chain of consequences a defendant should be held responsible for its wrongdoing." *Id.* (quoting *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 178 (2007)). Even assuming the truth of Maue's testimony that Read and others were aware from the outset of employment that his son had bipolar disorder, Maue's claim for damages arising out of the criminal assault is "so remote and attenuated from the alleged Title VII misconduct that it must be dismissed for lack of proximate causation." *Id.* (citing *Stepper v. England*, 14 F. App'x 859, 860 (9th Cir. 2001)). The Court should have no trouble granting the Motion on this basis.

**RELIEF REQUESTED**

For the foregoing reasons and as set forth more fully in the Motion, Champion respectfully requests that the Court grant the Motion; enter a take-nothing judgment for Champion and against Maue on all of Maue's claims, causes of action, and requests for relief, dismissing the same with prejudice; tax costs against Maue; and grant all other relief, general or special, at law or in equity, to which Champion may be justly entitled.

Respectfully submitted,

By: *\/s/ John M. Barcus*

JOHN M. BARCUS
Texas State Bar No. 24036185
john.barcus@ogletree.com
MOLLY ANN LAWRENCE
Texas State Bar No. 24083365
mollyann.lawrence@ogletree.com

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
8117 Preston Road, Ste. 500
Dallas, Texas 75225
Tel: (214) 987-3800
Fax: (214) 987-3927

**ATTORNEYS FOR DEFENDANT CHAMPION HOME BUILDERS, INC.**

**CERTIFICATE OF SERVICE**

This is to certify that on July 9, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the electronic system of filing, which will transmit a Notice of Electronic Filing to the parties' counsel of record.

*/s/ John M. Barcus*
JOHN M. BARCUS